**AFFIRM; and Opinion Filed January 6, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-11-01425-CV

### WELLS FARGO BANK, N.A., AS TRUSTEE FOR OPTION ONE MORTGAGE LOAN TRUST 2006-1 ASSET-BACKED CERTIFICATES, SERIES 2006-1, Appellant

### V.

### LONZIE LEATH, Appellee

On Appeal from the 95th Judicial District Court
Dallas County, Texas
Trial Court Cause No. 08-07290

## OPINION

Before Justices Moseley, O'Neill, and Brown[1]
Opinion by Justice Brown

Wells Fargo Bank, N.A., as Trustee for Option One Mortgage Loan Trust 2006-1 Asset-Backed Certificates, Series 2006-1, appeals the judgment voiding the deed of trust lien on Lonzie Leath's homestead and ordering forfeiture of the principal and interest on the related home equity adjustable rate note. Wells Fargo contests the sufficiency of the evidence to support the jury's finding of $421,400 as the fair market value of the homestead on the loan date (which established a Texas constitutional violation because the $340,000 loan exceeded eighty percent of the value of the homestead), the trial court's finding that Wells Fargo failed to cure the

---

[1] The Honorable Mary L. Murphy was a member of the Panel at the time this case was submitted. Due to her resignation from this Court on June 7, 2013, she did not participate in deciding the case. She was replaced on the Panel by Justice Ada E. Brown. *See* TEX. R. APP. P. 41.1(a).

violation, the evidentiary ruling allowing Leath's expert testimony, and the award of attorney's fees. Alternatively, Wells Fargo seeks equitable subrogation for advances made at Leath's request. We affirm the trial court's judgment.

**Background**

Leath owns a home in Cedar Hill, Texas that qualifies as his homestead. In 2005, he took out a home equity loan, backed by a lien on the house, for $340,000 from H&R Block Mortgage Corporation. After the loan closed, it was put in a pool and transferred to Wells Fargo, the trustee for the pool of loans. Option One Mortgage Corporation was the servicing agent on Leath's note.

Leath's loan was evidenced by a Texas home equity adjustable rate note executed by Leath on October 26, 2005. As part of the closing, Leath also signed a series of documents, one of which was a borrower's and lender's acknowledgment that the fair market value of the home was $425,000. That value was set by an independent appraisal performed by Clyde Crum in August 2005 and sent to the lender less than two weeks before the loan closed. Leath used the loan to retire a pre-existing 2004 debt on the property. The 2004 refinancing was based on appraisals stating a $350,000 fair market value for the property, which was dependent on completion of construction and repairs.

Just over two years after the 2005 home equity loan was signed, Leath sent the lender a letter dated January 15, 2008, asking to modify or restructure the loan to avoid foreclosure and allow him and his family to get things "back on track financially." In a second letter, he asked the lender to consider the fact that his hardship situation also was caused by the adjustable rate increase in his mortgage payments. Leath's request for a modification was unsuccessful, and Wells Fargo sought an order for foreclosure in March 2008. *See* TEX. R. CIV. P. 736.1. Leath

filed an answer to Wells Fargo's application for foreclosure and also filed the underlying declaratory-judgment action to abate the foreclosure. *See* TEX. R. CIV. P. 736.11(a). Leath alleged in both pleadings that the loan violated section 50(a)(6)(B) of the Texas Constitution because the outstanding debt exceeded eighty percent of the fair market value of the homestead on the date the loan was made. Leath further alleged Wells Fargo had been "notified of this failure to comply more than sixty (60) days ago and ha[d] not corrected the failure to comply in any way." Leath sought a declaration that Wells Fargo was not entitled to foreclose on the property because the loan violated the Texas Constitution and asked the trial court to order that all principal and interest under the extension of credit to be forfeited. Wells Fargo generally denied the allegations and further denied that the conditions precedent necessary for Leath's recovery had occurred or been satisfied.

The case was submitted to the jury on a single question, asking for the fair market value of the property on the date of the loan, October 26, 2005. The jury returned a verdict of $421,400. The trial court rendered judgment on July 8, 2011 over Wells Fargo's objection. And after finding the home equity loan violated the Texas Constitution and that Wells Fargo did not cure its violation within sixty days of being notified of the violation, the court declared the deed of trust lien void and the principal and interest on the note forfeited. Wells Fargo's motions to modify or reform the judgment and its motion for new trial, in which it challenged the sufficiency of the evidence on valuation, were overruled by operation of law.

### Home Equity Liens Under the Texas Constitution

By a 1997 amendment to the Texas Constitution, homeowners who have paid their home loans or accumulated equity in their homestead can voluntarily encumber their homestead with a lien in return for an extension of credit, i.e., a home equity loan. *See Doody v. Ameriquest*

*Mortg. Co.*, 49 S.W.3d 342, 343 (Tex. 2001); *Rivera v. Countrywide Home Loans, Inc.*, 262 S.W.3d 834, 837 (Tex. App.—Dallas 2008, no pet.). To be valid, a home equity loan must comply with numerous requirements set forth in the constitution. *See* TEX. CONST. art. XVI, § 50(a)(6)(A)–(Q); *see also Rooms With A View, Inc. v. Private Nat'l Mortg. Ass'n*, 7 S.W.3d 840, 847–48 (Tex. App.—Austin 1999, pet. denied) (noting requirements were designed to protect homeowners from predatory lenders). Of particular relevance here is the requirement that the amount of the home equity loan may not exceed eighty percent of the fair market value of the homestead on the date the extension of credit is made. TEX. CONST. art. XVI, § 50(a)(6)(B). When the requirements are not met, the lien is invalid, and all principal and interest are forfeited. *Id.* § 50(a)(6)(Q)(x); *Doody*, 49 S.W.3d at 345–46.

The failure to comply with the requirements, however, is not necessarily fatal to a home equity lender because the section gives a lender an opportunity to cure any failure on its part to comply with its constitutional obligations after receiving notification from the borrower of a violation. *See* TEX. CONST. art. XVI, § 50(a)(6)(Q)(x). Specifically, the "cure provision" provides that the lender must correct mistakes within sixty days of being notified by the borrower of the lender's failure to comply to validate a lien securing a home equity loan to avoid forfeiture of the principal and interest of the loan. *Id.*; *Doody*, 49 S.W.3d at 346. The cure provision of section 50(a)(6)(Q)(x) is triggered upon notice of the non-compliance to the lender by the borrower. *Curry v. Bank of Am., N.A.*, 232 S.W.3d 345, 353 n.6 (Tex. App.—Dallas 2007, pet. denied).

### Discussion

Wells Fargo raises four issues on appeal. It first contends the trial court erred when it signed a judgment that "went beyond finding and declaring the value of the property." Wells

Fargo also challenges the legal and factual sufficiency of the evidence supporting the jury's determination of fair market value (Issue Two), argues the trial court erred in allowing Leath's expert, Ann Piper, to testify and by admitting her report (Issue Three), and complains the trial court's award of attorney's fees only to Leath was not equitable and just (Issue Four). In a fifth alternative issue, Wells Fargo contends it was entitled to equitable subrogation for the credit extended to Leath to pay his prior lien.

### *Notice and Cure of the Alleged Constitutional Violation*

Wells Fargo argues in its first issue the trial court erred by signing a judgment declaring that the lien was invalid and the loan forfeited without submitting the question of Leath's notification and Wells Fargo's failure to cure within the sixty-day cure period. It asserts that after the jury resolved the factual dispute as to the home's value, the "parties should have been free, following an appropriate judgment, to continue their [debtor/creditor] relationship" because the violation was curable. Wells Fargo claims that instead and contrary to Texas Rule of Procedure 279, the trial court made findings in its judgment despite its objection and despite there being factually insufficient evidence to support the findings.

At the charge conference, Wells Fargo objected to the "submission of the charge to the jury, and to the question as worded." It asserted that if the case "goes in terms of value," the "disputes under the dec action" will not be fully resolved, adding, "[t]he Court, of course, has the discretion." The trial court overruled Wells Fargo's objection and submitted the question for the jury to determine the fair market value of Leath's home on the date of the loan, which it did. Based on that finding, the trial court found that the home equity loan was greater than eighty percent of the fair market value of the home on the date of the loan and declared that the loan

violated the Texas Constitution. The trial court also found that Wells Fargo "did not cure its failure to comply within 60 days of being notified of this violation."

Wells Fargo's primary contention is that Leath did not satisfy the notice predicate to the forfeiture; it contends that because it denied performance of conditions precedent, Leath had to prove notice and he failed to do so. Wells Fargo essentially argues the issue of notice—that is, did Leath notify the lender of the valuation issue—was a fact question that should have been submitted to the jury. It claims its objection to the omission of the issue in the court's charge precludes "any finding by the trial court on the element not submitted to the jury" and as a consequence, Leath "waived one of the controlling issues upon which he relied for recovery."

Leath responds that Wells Fargo did not complain to the trial court about notice until after the jury's verdict was received and Leath was requesting entry of the judgment. He also argues that the issue of notice was uncontested and Wells Fargo presented no evidence of an attempt to cure at any time. We agree with Leath.

Texas Rule of Civil Procedure 279 directs courts on "how to proceed when an element of a 'ground of recovery or defense' is omitted from a jury charge." *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (quoting TEX. R. CIV. P. 279). The rule embodies principles from case law that "when some but not all elements of a claim or cause of action are submitted to and found by a jury, and there is no request or objection with regard to the missing element, a trial court may expressly make a finding on the omitted element, or if it does not, the omitted element is deemed found by the court in a manner supporting the judgment if the deemed finding is supported by some evidence." *Id.* at 262–63. The rule applies to "grounds of recovery or of defense *not conclusively established* under the evidence and no element of which is submitted or requested are waived." TEX. R. CIV. P. 279 (emphasis added).

But when the evidence conclusively establishes the required elements (even if none of the elements is submitted to the jury for consideration), the claim is not waived under rule 279. *Bank of Tex. v. VR Elec., Inc.*, 276 S.W.3d 671, 677 (Tex. App.—Houston [1st Dist.] 2008, pet, denied). If a claim is established as a matter of law, no question must be submitted to the jury for consideration. *Brown v. Bank of Galveston*, 963 S.W.2d 511, 515 (Tex. 1998), *abrogated on other grounds by Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 814–15 (Tex. 2005) ("Jurors are not free to reach a verdict contrary to [the] evidence; indeed uncontroverted issues need not be submitted to a jury at all."); *Sullivan v. Barnett*, 471 S.W.2d 39, 44 (Tex. 1971) ("Submission of an issue on an undisputed fact is unnecessary."); *Wright v. Vernon Compress Co.*, 296 S.W.2d 517, 523 (Tex. 1956) ("[T]he trial court is required to submit only controverted issues. No jury finding is necessary to establish undisputed facts."); *cf. Welborn Mortg. Corp. v. Knowles*, 851 S.W.2d 328, 331 (Tex. App.—Dallas 1993, writ denied) ("Ordinarily, notice is a question of fact. Notice becomes a question of law only when there is no room for ordinary minds to differ about the proper conclusion the fact finder must draw from the evidence."). Thus, when the evidence conclusively establishes a claim or element, the claim may be part of the judgment, even if no jury question on the claim was submitted. *VR Elec., Inc.* 276 S.W.3d at 677.

During its case in chief, Wells Fargo called Leath to testify about the two financial hardship letters Leath sent Option One in January 2008, which were admitted as Defense exhibits 48 and 49. Leath agreed that he did not say anything in those letters about the home equity loan being more than eighty percent of the value of his home. At Wells Fargo's request, the trial court also admitted exhibits 50 and 51, Wells Fargo's application for foreclosure and Leath's answer to the application, respectively. The exhibits were not admitted for any limited

purpose. In his answer, Leath asserted as an affirmative defense that "the home equity loan and resultant mortgage in question violates Article 16, Section 50, of the Texas Constitution" because the loan "exceeded eighty [percent] of the actual fair market value of the property at the time the loan was closed." Although Leath testified that his answer to the foreclosure application was not the first time he brought up the issue of value (he said he previously complained the repairs had not been factored in to the value), he also testified that his lawyers highlighted the issue for him and he depended on his lawyers to present any defenses he may have under the Texas Constitution.

A borrower provides adequate notice of the lender's failure to comply with the section's requirements by taking "reasonable steps to notify the lender or holder of the alleged failure to comply." 7 TEX. ADMIN. CODE § 153.91(a) (effective Nov. 11, 2004); *see also Curry*, 232 S.W.3d at 353–54 (looking to section 153.91 as instructive in determining whether notice is adequate).[2] The notice must include a reasonable identification of the borrower and the loan as well as a description of the failure to comply. 7 TEX. ADMIN. CODE § 153.91(a)(1)–(3). A general allegation or mere statement that the loan was infirm is not enough; the borrower must describe how the loan is non-compliant because to determine how to cure the non-compliance, "the lender must be aware of what that non-compliance is." *Curry*, 232 S.W.3d at 353.

Leath's answer to Wells Fargo's application for foreclosure, which was filed and served on April 3, 2008 and admitted into evidence at trial, meets these requirements. *See, e.g.*, *In re Gulley*, 436 B.R. 878, 890–91 & n.57 (Bankr. N.D. Tex. 2010) (stating 60-day opportunity-to-

---

[2] Section 153.91 of the administrative code is one of six sections "adopting the interpretation of the cure provision" by the Texas Finance Commission and the Texas Credit Union Commission, the agencies responsible for interpreting the home equity provisions in the Texas Constitution. *Curry*, 232 S.W.3d at 353–54; *see also* TEX. CONST. art. XVI, § 50(u) (legislature may designate one or more state agencies with authority to interpret the home equity provisions); TEX. FIN. CODE ANN. §§ 11.308, 15.413 (providing Texas Credit Union Commission and Texas Finance Commission, respectively, may interpret the home equity loan provisions upon request or on its own motion).

cure period under Texas constitution ran when adversary proceeding was filed); *In re Cadengo*, 370 B.R. 681, 698 (Bankr. S.D. Tex. 2007) (concluding "60-day window to cure" began to run on date complaint was filed); *In re Adams*, 307 B.R. 549, 558 (Bankr. N.D. Tex. 2004) (holding lender received notice of defective loan on date recited in certificate of service accompanying the adversary complaint); *Puig v. Citibank, N.A.*, Civil Action No. 3:11-CV-0270-L, 2012 WL 1835721, at *15 (N.D. Tex. May 21, 2012) (stating borrower's complaint filed and served put lender on notice of alleged constitutional violations), *aff'd*, 514 Fed. Appx. 483 (5th Cir. 2013). Leath's answer informed Wells Fargo, as trustee for Option One Mortgage Trust, of the potential constitutional violation; it specifically stated the loan and resulting mortgage violated the Texas Constitution because the amount of the loan exceeded eighty percent of the value of the property. *See* 7 TEX. ADMIN. CODE § 153.91(a)(1)–(3). Similarly, Leath also alleged in his original petition, which was filed and served in July 2008, the same violation. Leath's answer referenced the foreclosure application filed by Wells Fargo, and his petition identified the property securing the deed of trust lien.

Wells Fargo maintains that Leath's answer was not a form of notice because pleadings are not admissible in evidence to prove the facts alleged therein. The issue of whether Leath notified Wells Fargo concerns the effect of the allegations pleaded, not whether the allegations are true. Wells Fargo does not explain how the pleading did not inform it of the alleged constitutional violation. Nor does it explain why the specific allegation does not constitute "reasonable steps" to notify Wells Fargo of a possible violation. Instead, Wells Fargo contends that because Leath was facing foreclosure, "he changed horses" and complained that the property value was too high, which it claims is a "compelling fact" weighing against the argument that Leath's answer notified Wells Fargo of a violation. Leath testified, however, that he was

unaware of the constitutional provisions and that he relied on his lawyers to provide him advice on the constitutional provisions. Wells Fargo also argues that the pleading was provided to Wells Fargo as opposed to Option One, who was the designated party to receive notice as stated in the note. But the attachments to Wells Fargo's application shows Option One assigned all beneficial interest in Leath's deed of trust to Wells Fargo. And under the administrative code, the borrower "may always deliver written notice to the registered agent of the lender or holder even if the lender or holder has named a delivery location." *Id.* § 153.93. Leath sent the pleading to Wells Fargo through its counsel.

Wells Fargo's contentions that it challenged and controverted the evidence submitted by Leath regarding notice are not supported by the record. While Wells Fargo challenged the statements made in the financial-hardship letters Leath sent Option One requesting a loan modification, it did not controvert the fact that the pleadings raised the issue that the amount of the loan exceeded eighty percent of the fair market value of the home on the date of the loan. We conclude the issue of notice was conclusively established by the evidence in the record and therefore, it was unnecessary to submit the question of whether Leath notified Wells Fargo of its alleged non-compliance with the constitution to the jury.

Finally, Wells Fargo argues the trial court should have submitted a jury question on its failure to cure within sixty days of being notified of the violation. It contends only controverted evidence was elicited at trial on the element of notice and cure, yet the issues of notice and cure were omitted from the court's charge. Although Wells Fargo maintains its failure to cure the violation upon being notified was an element Leath was required to prove,[3] it only addressed the

---

[3] Citing this Court's opinion in *Curry*, 232 S.W.3d at 352–53, Wells Fargo asserts the burden was on Leath, as the party seeking a declaration that his home equity loan is invalid, to prove not only that the loan failed to comply with the constitutional requirements, but also that he notified Wells Fargo of the non-compliance and Wells Fargo failed to cure the violation upon being notified. *Curry* involved the question of whether the

issue in passing with the issue of notice, not as a separate element Leath failed to prove. And unlike its contentions related to whether Leath gave notice of the alleged failure to comply with the constitution, it provides no analysis explaining how the evidence failed to show it did not cure the violation within the sixty-day period. It concluded its argument of its first appellate issue by stating, "[t]here being no establishment that Leath noticed Option One – a lender or holder of the note with a description of the alleged failure to comply, the Court erred in entering a judgment that the lien was invalid and the loan forfeit[ed]." Indeed, at oral argument, Wells Fargo stated there was no attempt to cure because no notice of a violation was given. In sum, Wells Fargo's briefing related to whether the trial court erred in rendering a judgment that found Wells Fargo did not cure its failure to comply within the cure period is inadequate, so we do not address it. *See In re M.A.S.*, 233 S.W.3d 915, 924 (Tex. App.—Dallas 2007, pet. denied) ("Failure to provide substantive analysis waives an issue on appeal."). We overrule Wells Fargo's first issue.

### Sufficiency of the Evidence of Fair Market Value

Wells Fargo argues in its second issue that the evidence was legally and factually insufficient to support the jury's finding that the fair market value of Leath's homestead on October 26, 2005, the date of the loan, was $421,400.

When an appellant challenges the legal sufficiency of the evidence on a matter for which it did not bear the burden of proof, it must demonstrate on appeal there is no evidence to support the trial court's adverse findings. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). Under

---

borrower notified the lender of an alleged constitutional violation; notice in that case was disputed. *Id.* at 353. Looking to the administrative code for guidance, we concluded that the borrower's general allegation contained in a letter did not describe how the loan was non-compliant and therefore, the borrower did not satisfy the notice requirement. *Id.* at 354. Based on our conclusion, we did not address whether the lender satisfied its obligation to cure. *Id.* We note that section 153.94 of the administrative code provides that the "lender or holder has the burden of proving compliance with this section," entitled "Methods of Curing a Violation Under Section 50(a)(6)(Q)(x)." Because it is not necessary for our analysis, however, we express no opinion on whether the borrower or lender has the burden of proof to show the lender failed to cure the violation upon being notified.

a no-evidence point, we consider the evidence in the light most favorable to the verdict, indulging every reasonable inference in support. *City of Keller*, 168 S.W.3d at 822. We are mindful in our review that jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. *Id.* at 819. The jury's credibility determinations, however, must be reasonable; "[j]urors cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *Id.* at 820. A legal sufficiency challenge fails if there is more than a scintilla of evidence to support the judgment. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827. Evidence that does no more than create a surmise or suspicion is insufficient to rise to the level of a scintilla and, in legal effect, is no evidence. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

To evaluate a factual sufficiency challenge, we must consider and weigh all the evidence; we can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). If we affirm a challenged jury verdict as being supported by factually sufficient evidence, we need not detail all the evidence in support of the verdict. *In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 211 (Tex. 2009) (orig. proceeding) (citing *Ellis Cnty. State Bank v. Keever*, 888 S.W.2d 790, 794 (Tex. 1994)). But if we conclude the verdict is not supported by factually sufficient evidence, we should "detail the evidence relevant to the issue" and "state in what regard the contrary evidence greatly outweighs the

- 12 -

evidence in support of the verdict." *Pool*, 715 S.W.2d at 635. We must not substitute our judgment for that of the jury and should remain cognizant that the jury is the sole judge of witness credibility. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

When we consider the evidence in the light most favorable to the verdict, we conclude there was more than a scintilla of evidence to support the jury's answer that the fair market value of the home was $421,400 on October 26, 2005. Clyde Crum, Wells Fargo's expert and the person who performed the 2005 appraisal for Leath's home equity loan, was called as a witness by Leath and testified that the value of the property was $425,000 on the date of the loan. Crum determined that value based on comparable sales market data and an examination of the property. Crum said that at the time of the appraisal, the house had been completely remodeled, and during his examination of the house, he did not notice any obvious repairs that needed to be done. According to Crum's appraisal report, the appraisal for a value of $425,000 was made "as is."

Crum explained, however, that if a home needs repairs, his appraisal would state whether the value was conditioned on the repairs having been completed. Crum acknowledged a list of upgrades and improvements he received from Leath that Crum attached to his appraisal report. Crum agreed the list included an entry that some remaining electrical work needed to be done with a completion cost of $3,600. Crum testified that if the need for electrical work "hadn't been mentioned [in the attachment, he] would have mentioned it in [his] report." He also testified that the $3,600 in electrical work should be deducted from the value of $425,000.

Leath testified that when Crum performed the appraisal, Crum pointed out "some problems" with the house, including "electrical," and they "talked about [how] the repairs were going to have to be made." Leath further testified that he thought the value of $425,000 Crum

- 13 -

listed in his appraisal report was "contingent upon the repairs being done." Thus, the jury heard testimony that the home, which Crum valued at $425,000, needed some electrical work estimated to cost $3,600. Crum testified that "if the value was going to include those repairs having been completed," it would have been mentioned in his report. And after considering the attachment to his appraisal report and the remaining electrical work to be done, Crum agreed that the value was "425,000 minus 3,600", for a value of $421,400—the amount the jury found to be the fair market value of the property. Based on this evidence, we conclude that reasonable and fair-minded people could reach the verdict under review. *City of Keller*, 168 S.W.3d at 827. Wells Fargo's legal sufficiency fails.

Likewise, after we consider and weigh all the evidence, we conclude the jury's finding was supported by factually sufficient evidence. As previously stated, the jury heard testimony that the value of $425,000 assessed by Crum should be reduced by the cost to complete the remaining electrical work. Although Crum testified he did not remember talking to Leath in 2005 about "some electrical work that needed to be done" for $3,600, Crum acknowledged the attachment to his appraisal stating electrical work remained, that if the need for the repair had not been stated there, he would have included the statement in his report, and that the $3,600 should be deducted.

Wells Fargo argues that the jury's finding was clearly wrong and unjust because "the evidence adduced at trial included numerous instances where the $425,000.00 value was expressly stated as Leath's positive assertion." Wells Fargo specifically refers to the documents Leath signed at closing in which Leath swore the fair market value of the home on the date of the loan was $425,000 and that the principal loan amount did not exceed eighty percent of the fair market value of the home on the date the extension of credit was made. Wells Fargo also refers

- 14 -

to Crum's appraisal reporting the value of $425,000 and Crum's testimony that the value he placed on the property using a market data approach was $425,000.

The jury's answer that the fair market value of the home on the relevant date was $421,400, however, takes into account the appraisal value of $425,000 as stated in the closing documents. Leath testified he signed the closing documents and agreed he received a loan of $340,000 from H&R Block based on the $425,000 value. He said he did not know the value of his home in 2005 and emphasized that numerous repairs needed to be completed. Leath also testified he did not see the appraisal before he signed the closing documents but he thought the value in the appraisal was contingent on the completion of certain repairs. Crum testified the home appeared to be recently remodeled and that he may have asked for the list of upgrades that he attached to his appraisal report to find out "how much updating was actually done." Crum agreed that the attachment said $3,600 in electrical work had not been completed. Wells Fargo makes no argument as to why Crum's testimony that the value should be reduced by the cost of the electrical repairs was incorrect or should be disregarded. Nor does it point to any contrary evidence showing the electrical work had been completed or that the $425,000 value took the electrical work into account. Thus, on this record, the evidence is not so weak as to render the jury's answer of $421,400 unfair or unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242. We overrule Wells Fargo's second issue.

### *Admission of Piper's Testimony and Report*

In its third issue, Wells Fargo complains the trial court erred in permitting Leath's expert witness, Ann Piper, to testify as to her opinion of the value of Leath's home in 2005 and by admitting her appraisal report.

Prior to trial originally scheduled for January 24, 2011, Wells Fargo filed an objection to Leath's designation of Piper as his expert witness, asserting the discovery period ended on September 29, 2009 and Leath had not identified Piper as a retained expert until its supplemental discovery responses dated August 24, 2010. Counsel for Wells Fargo argued his client was unfairly surprised and prejudiced by the late designation and that Wells Fargo did not want to take additional depositions or continue discovery. In response, counsel for Leath argued the expert had been disclosed in August, five months before the scheduled trial, and Wells Fargo had made no attempt to obtain more information from the expert through a deposition. Additionally, Leath's counsel offered to continue depositions as long as Wells Fargo needed regarding the expert testimony. Counsel also justified the delay in designating an expert because the parties were continuing to address modification of the loan and, because of Leath's financial issues, hiring an expert for the lawsuit was an additional expense they hoped to avoid.

The trial court denied Wells Fargo's request to strike Piper by order signed December 14, 2010, and the case was reset for trial in May 2011. On May 4, 2011, Wells Fargo re-urged its objections to Leath's designation of Piper as an expert, arguing that Piper's testimony and report should be excluded because Leath's designation was untimely and adding that Piper's report was signed December 14, 2010 but was not delivered by fax until December 20, 2010. It further complained that the report showed an inspection of the property occurred on July 9, 2010. Wells Fargo also argued that Piper's opinion was unreliable and failed to meet "most of the *Robinson* factors." *See E.I. du Pont Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). The trial court heard the re-urged motion to exclude the testimony of Piper and her report during pretrial and again before the jury. The court denied the motion and overruled the objections to her testimony. Wells Fargo later cross-examined Piper without objecting to her testimony.

At trial, Piper testified to her opinion that the fair market value of the home on the date of the loan was $268,000. Piper explained that her appraisal was based on sales of comparable homes located in the same neighborhood and an examination of Leath's home. She specifically testified to problems she observed in the house, including "prominent" problems with the tile floors and carpet and damage to the base trim and walls. She received estimates from Leath to correct the problems and testified that because the condition of the property affects the value of the home, "there was [an] adjustment made [in her value assessment] for the condition of the property." Piper did not examine the home in 2005, and she admitted that she did not know whether the conditions she saw in July 2010 existed five years earlier. Nor did she attach any photographs to her appraisal report showing the problems she observed. She also admitted she did not know what other factors may have existed leading to Crum's appraisal value of $425,000.

On appeal, Wells Fargo asserts it was unfairly prejudiced by the trial court's decision to allow Piper's testimony and report because Piper was not timely disclosed as an expert witness and Leath did not comply with Texas Rule of Civil Procedure 194.2(f) (providing materials). Wells Fargo also argues Piper's testimony and report were unreliable because Piper's report indicates she did not have comparable sales listings for the period when the loan closed and makes no mention of what methods were used to determine the value retrospectively.

The decision of whether to admit or exclude evidence is committed to the sound discretion of the trial court. *Lopez v. La Madeleine of Tex., Inc.*, 200 S.W.3d 854, 859–60 (Tex. App.—Dallas 2006, no pet.). A trial court abuses its discretion in admitting testimony or evidence if it acts without reference to any guiding rules or principles or if the act complained of

is arbitrary and unreasonable. *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 687 (Tex. 2002); *Lopez*, 200 S.W.3d at 860.

The erroneous admission of evidence, however, requires reversal "only if the error probably (though not necessarily) resulted in an improper judgment." *Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004); *see also* TEX. R. APP. P. 44.1(a)(1). That determination is "a judgment call entrusted to the sound discretion and good sense of the reviewing court" and must be made "from an evaluation of the whole case." *First Emps. Ins. Co. v. Skinner*, 646 S.W.2d 170, 172 (Tex. 1983); *Nissan Motor Co.*, 145 S.W.3d at 144 (noting "whether erroneous admission is harmful is more a matter of judgment than precise measurement"). We review the entire record to determine "whether the judgment was controlled by the evidence that should have been excluded." *Lopez*, 200 S.W.3d 864; *see also City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex. 1995) ("A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted.").

In this case, we need not evaluate Wells Fargo's complaints in detail because even if we assume the trial court erred in admitting Piper's testimony and report, Wells Fargo has failed to make the requisite showing that the ruling probably caused the rendition of an improper judgment. *See Nissan Motor Co.*, 145 S.W.3d at 144; *Barfield v. SST Truck Co., L.L.C.*, 220 S.W.3d 206, 211 (Tex. App.—Dallas 2007, no pet.). It is clear from reviewing the record that the jury was not influenced by Piper's opinion that the value of Leath's home in October 2005 was $268,000. *See, e.g.*, *Louder v. De Leon*, 754 S.W.2d 148, 149 (Tex. 1988) (per curiam) (noting that "[j]urors realize that they are the final triers to decide the issues" and jurors "may accept or reject an expert's view"). Piper was one of two experts who testified on value. Piper

testified she based her assessment of the home's value, in part, on her conversations with Leath and her observations of the condition of the home, some of which she said would not be visible in a photograph. Leath testified that when Piper inspected the property in July 2010, the property was in the same condition as it was when Crum was there in 2005. He also testified that he had photographs of the interior of the house in 2005 but none were admitted into evidence. Piper's report did not include any photographs of the home.

The other expert was Crum, who performed the 2005 appraisal for purposes of Leath's home equity loan and appraised the market value of the house at $425,000. Crum testified that when he saw the house in 2005, it had been completely remodeled and was in "excellent condition." Crum attached photographs of the interior and exterior of the house to his appraisal. Crum acknowledged that Leath had provided him with a list of upgrades and improvements that had been done and had indicated that electrical work estimated to cost $3,600 remained. And Leath testified that the $425,000 assessed by Crum "would have been the correct value" if the repairs had been done. Leath testified to some construction issues and needed repairs related to the tile floors and baseboards, but the jury was only provided the estimated cost for the remaining electrical work. Crum testified the cost of the electrical work should be deducted from the value of $425,000, for a value of $421,400. That is the amount the jury found to be the fair market value of the property on the date of the loan, which we have concluded was supported by sufficient evidence.

Wells Fargo contends Piper's testimony "confused the issues" or "evoked sympathy from the jury resulting in a reduction of the value Leath had acknowledged so many times before." And to demonstrate it was harmed by her testimony, it asserts that it "would not have had the need to introduce the substantive testimony of Clyde Crum to rebut Ann Piper's testimony"

- 19 -

because Crum's report would have been sufficient. Crum, however, was initially called by Leath to testify; Crum's testimony was presented after Piper and Leath had testified and been cross-examined by Wells Fargo. Wells Fargo did not cross-examine Crum at the time and instead, presented Crum's testimony on direct examination for the defense.

Piper's testimony was that in her opinion, the fair market value of the home on the date of the loan was $268,000. There is no testimony from Leath in which he stated he thought the value of his home in 2005 was that amount. Rather, Leath acknowledged the documents he signed at closing but stated that he thought the value assessed by Crum for purposes of the loan was contingent upon certain repairs being done. Leath testified that $425,000 would have been the "correct value" if the repairs had been done. The jury did not reduce the closing value by a significant amount. It reduced the $425,000 value by $3,600, the cost to complete remaining electrical work, which Crum said should be deducted from the value.

Thus, a review of the entire record reveals the jury's answer did not turn on Piper's testimony or report as to the fair market value of the home, but rather, on Crum's assessment, including the upgrades and improvements, and knowledge of remaining repairs. *See City of Brownsville*, 897 S.W.2d at 753–54.[4] We therefore conclude Wells Fargo has not established the trial court's ruling allowing Piper's testimony and report probably caused the rendition of an improper judgment. *See Barfield*, 220 S.W.3d at 211. We overrule Wells Fargo's third issue.

### Award of Attorney's Fees

In its fourth issue, Wells Fargo argues the trial court erred in awarding attorney's fees to Leath because the ruling is based on the misperception that Leath was the prevailing party. It

---

[4]The record also reveals that during its deliberations, the jury submitted a jury note with six questions. The questions related to the "big ticket items" included on the list of upgrades and improvements prepared by Leath and attached to Crum's report, and the timing of when the "electrical" was fixed. It also asked for "a copy of Crum's testimony."

also argues that even assuming Leath was the prevailing party, the trial court had discretion to award fees to Wells Fargo as a non-prevailing party because the award would be equitable and just under the circumstances.

Under the Uniform Declaratory Judgments Act, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2008). A grant or denial of attorney's fees in a declaratory judgment action lies within the sound discretion of the trial court. *Oake v. Collin Cnty.*, 692 S.W.2d 454, 455 (Tex. 1985). The court's judgment will not be reversed on appeal absent a clear showing that it abused its discretion. *Id.*; *A & L Eng'g & Consulting, Inc. v. Shiloh Apollo Plaza, Inc.*, 315 S.W.3d 928, 930 (Tex. App.—Dallas 2010, no pet.).

Here, the parties stipulated to the amounts for reasonable and necessary attorney's fees through trial and if the case is appealed. Based on our resolution of Wells Fargo's appellate issues and this opinion affirming the trial court's judgment, we cannot conclude the trial court abused its discretion by awarding Leath his fees. We overrule Wells Fargo's fourth issue.

### Equitable Subrogation

Wells Fargo argues alternatively in its fifth issue that if Leath's home equity loan did not comply with constitutional requirements, Wells Fargo still was entitled to equitable subrogation for the $279,581.74 in loan proceeds advanced to Leath to pay his prior valid lien. Leath responds that Wells Fargo waived any request for equitable subrogation because the issue was never raised in the trial court. Wells Fargo does not dispute its failure to raise the issue; rather, it argues it never had the chance to assert its right to equitable subrogation because the value of the property was disputed prior to the jury's verdict. It does not explain how it was prevented from pleading equitable subrogation in the alternative—as it has done here—or cite any authority that

would allow it to raise the issue for the first time on appeal. We therefore agree that Wells Fargo waived its claim for equitable subrogation. *See Monk v. Dallas Brake & Clutch Serv. Co.*, 697 S.W.2d 780, 782 n.2 (Tex. App.—Dallas 1985, writ ref'd n.r.e.) (party claiming subrogation must plead right to subrogation); *Pape Equip. Co. v. I.C.S., Inc.*, 737 S.W.2d 397, 402–03 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.) (same); *see also First Cont'l Real Estate Inv. Trust v. Cont'l Steel Co.*, 569 S.W.2d 42, 45 (Tex. Civ. App.—Fort Worth 1978, no writ) (equitable subrogation is affirmative defense that must be properly pleaded and cannot be raised for first time on appeal). We overrule Wells Fargo's fifth issue.

### Conclusion

Having overruled Wells Fargo's issues, the judgment of the trial court is affirmed.

/Ada Brown/
ADA BROWN
JUSTICE

111425F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

WELLS FARGO BANK, N.A., AS
TRUSTEE FOR OPTION ONE
MORTGAGE LOAN TRUST 2006-1
ASSET-BACKED CERTIFICATES,
SERIES 2006-1, Appellant

No. 05-11-01425-CV        V.

LONZIE LEATH, Appellee

On Appeal from the 95th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. 08-07290.
Opinion delivered by Justice Brown.
Justices Moseley and O'Neill participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**. It is **ORDERED** that appellee Lonzie Leath recover his costs of this appeal from appellant Wells Fargo Bank, N.A., as Trustee for Option One Mortgage Loan Trust 2006-1 Asset-Backed Certificates, Series 2006-1.

Judgment entered this 6th day of January, 2014.

/Ada Brown/
ADA BROWN
JUSTICE

- 23 -