# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-12-00560-CV

**The Texas State Board of Pharmacy, and in their official capacities only, Gay Dodson, Executive Director; and Jeanne D. Waggener, President of the Board, Appellants**

**v.**

**Tiana Jean Witcher, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT NO. D-1-GN-12-000026, HONORABLE TIM SULAK, JUDGE PRESIDING

## O P I N I O N

We withdraw our opinion and judgment dated May 3, 2013, and substitute the following in its place. The appellants' motion for rehearing is overruled.

After a contested-case hearing, the Texas State Board of Pharmacy ("the Board") indefinitely suspended Tiana Jean Witcher's pharmacist license. Witcher filed a suit for judicial review of the Board's order. *See* Tex. Gov't Code § 2001.176. The trial court reversed the Board's order and remanded the cause to the Board, concluding that the indefinite suspension of Witcher's license was arbitrary and capricious and also was based on an invalid rule. *See id.* § 2001.174(2). We will affirm the trial court's judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

The facts of this case are largely undisputed. Witcher received her Texas pharmacist license in 1987 and her North Carolina pharmacist license in 1992 via reciprocity. In November 2007, her husband died in a car accident two weeks after they were married. In October 2008, near the anniversary of his death, Witcher became so intoxicated during her personal time that she had to be treated for alcohol poisoning. On the advice of a colleague, Witcher self-referred to the North Carolina Pharmacist Recovery Network (NCPRN), a program that aids impaired pharmacists, to address alcohol-abuse issues in her personal life. She voluntarily entered into a monitoring contract with NCPRN in January 2009.

Witcher subsequently came under scrutiny by the North Carolina licensing authority when she failed to comply with some of the terms of her voluntary monitoring agreement with the NCPRN. Due to the compliance issues, the North Carolina licensing authority suspended Witcher's pharmacist license in April 2010 based on concerns that she was unfit to practice pharmacy. In suspending Witcher's license, the North Carolina licensing authority found that she had "[i]ndulged in the use of drugs to an extent that renders the pharmacist unfit to practice pharmacy" and "[d]eveloped a physical or mental disability that render[ed her] unfit to practice pharmacy with reasonable skill, competence and safety to the public." *See* N.C. Gen. Stat. Ann. § 90-85.38(a)(3), (5). Under the North Carolina suspension order, Witcher is ineligible to petition for reinstatement of her license until the NCPRN advocates for its reinstatement, a condition presumably directed to

2

ensuring her fitness to practice pharmacy.[1]  The North Carolina order further specifies that only the NCPRN may monitor Witcher's recovery.

After Witcher's North Carolina license was suspended, she returned to Texas to live with her father because she lacked means to earn a living in North Carolina, had lost her house in foreclosure, and had no family or support system in North Carolina.  Upon returning to Texas, she voluntarily enrolled in the Texas Pharmacist Recovery Network (TxPRN), became successfully employed as a pharmacist, and participated in therapy.  Witcher averred that she did not abuse alcohol after her October 2008 hospitalization, did not abuse alcohol on the job, and sought assistance from NCPRN and TxPRN on her own initiative.  While in Texas, Witcher has exhibited no signs of alcohol impairment in the workplace or elsewhere.

Based on the active suspension of Witcher's license in North Carolina, however, the Board instituted disciplinary proceedings to suspend Witcher's Texas license until the suspension of her North Carolina license has been lifted.  *See* Tex. Occ. Code § 565.001(a)(16) (authorizing disciplinary action against licensed pharmacist disciplined by another state).  Along with the disciplinary complaint, the Board's staff filed a motion for summary disposition, asserting that, as a matter of law, (1) Witcher was subject to discipline under section 565.001(a)(16) of the Texas Pharmacy Act (TPA), which authorizes the Board to discipline a license holder who has "been disciplined by the regulatory board of another state for conduct substantially equivalent to conduct

---

[1]  The North Carolina suspension order notes that becoming eligible to petition for reinstatement does not guarantee that such petition will be granted.  Thus, even if Witcher satisfies the precondition to applying for reinstatement, her license would remain suspended indefinitely under the North Carolina suspension order.

described under this subsection"; (2) the violations found by the North Carolina licensing authority were, as a matter of law, substantially equivalent to conduct prohibited in TPA sections 565.001(a)(4) and (a)(7); and (3) the appropriate disciplinary sanction was "a period of suspension in Texas to run concurrently with the North Carolina suspension." *See id*. §§ 565.001(a)(4) (pharmacist may be disciplined upon "developing an incapacity that prevents the applicant or license holder from practicing pharmacy with reasonable skill, competence, and safety to the public"), (a)(7) (pharmacist may be disciplined for "us[ing] drugs in an intemperate manner that, in the board's opinion, could endanger a patient's life"), (a)(16) (pharmacist may be disciplined based on disciplinary action in another state for conduct that would violate the TPA); 565.051 (discipline for violation of TPA includes revocation, suspension, probated suspension, and licensing restrictions).

Witcher admitted that she was subject to being disciplined by the Board based on the North Carolina disciplinary action. However, because she had not abused alcohol since October 2008 and it was undisputed that she was presently fit to practice pharmacy, she advocated for a five-year probated suspension in keeping with Board precedent in disciplinary proceedings involving impaired pharmacists who had engaged in significantly more egregious conduct but who had demonstrated current fitness to practice to the Board's satisfaction.

The administrative law judge (ALJ) who presided over the disciplinary proceedings granted partial summary disposition as to Witcher's violation of the TPA but denied summary disposition regarding the appropriate sanction to be imposed.[2] *See* 1 Tex. Admin. Code § 155.505

---

[2] In granting partial summary disposition, the ALJ concluded from the following undisputed facts that Witcher was subject to disciplinary action by the Board in accordance with section 565.001(a)(16) of the TPA:

4

1. Tiana J. Witcher (Respondent) holds pharmacist license No. 30135 issued by the Texas State Board of Pharmacy (Board) on October 21, 1987.

2. On or about April 20, 2010, the North Carolina Board of Pharmacy (NCBP) entered a Final Order against the North Carolina license No. 11664 held by [Witcher]. That order made the following Findings of Fact:

    a) On or about January 29, 2009, [Witcher] voluntarily entered a substance abuse program administered by North Carolina Pharmacist Recovery Network (NCPRN). At that time Respondent entered into a contract governing the terms of her participation in the program (Contract).

    b) Between approximately March 2009 and November 2009, Respondent violated the terms of the Contract in various ways, including but not limited to:

        i. By failing to call in to determine if she should be drug tested on or about March 14, 2009, April 15, 2009, and April 17, 2009;

        ii. By submitting dilute urine samples on or about June 9, 2009, July 27, 2009, September 8, 2009, October 21, 2009, and November 24, 2009;

        iii. By violating the Contract's limitations on her employment, specifically by working the third shift at the North Carolina Baptist Hospital Pharmacy in or about April 2009, without approval from NCPRN, and after NCPRN had denied her request for such approval; and

        iv. By failing to participate in the required sessions of continuing care in July 2009.

3. The April 10, 2010, Order placed [Witcher's] license on an indefinite suspension with the requirement that she may not petition for reinstatement unless she provides the NCBP with written notice from

5

(2014) (State Office of Admin. Hearings, Summary Disposition) (authorizing ALJ to issue decision without evidentiary hearing if no genuine issue of material fact and party is entitled to decision as matter of law). After an evidentiary hearing directed solely to the appropriate sanction, the ALJ recommended a five-year probated suspension, finding among other things that (1) Witcher voluntarily entered into a participation agreement with TxPRN, (2) she had complied with all terms and conditions of her TxPRN participation agreement, (3) she had been sober since October 22, 2008, which was prior to her self-referral to NCPRN, and was not working when she was impaired due to alcohol use, (4) she "can safely practice pharmacy in Texas," (5) the mitigating factors in her case outweighed the aggravating factors, (6) it was "not feasible for [Witcher] to participate in the NCPRN program as a precondition to having the suspension of her North Carolina license lifted, and it is not financially viable for her to return to North Carolina," and (7) the North Carolina licensing authority would not accept Witcher's participation in the TxPRN program as a substitute for the requirement that she participate in the NCPRN program. The ALJ further found that, in relocating to Texas, Witcher was "not seeking to evade compliance with the reinstatement provisions of the North Carolina order, but only to avoid the considerable financial hurdles she would face to achieve that compliance."

The Board adopted all of the ALJ's recommended findings of fact and conclusions of law without modification. However, in keeping with the Board's unwritten policy that a

NCPRN that NCPRN will advocate for [her] reinstatement.

4.  [Witcher] had been disciplined by a regulatory board of another state for conduct substantially equivalent for which the Board may discipline a licensee.

6

pharmacist with an active suspension in another state cannot practice pharmacy in Texas, the Board rejected the ALJ's recommended sanction and instead suspended Witcher's Texas license until her North Carolina license has been reinstated. The Board also required Witcher to submit to simultaneous monitoring by the TxPRN, even though the terms of both the NCPRN and TxPRN agreements require Witcher to be physically present to participate in or complete several of the tasks, including meeting attendance and drug and alcohol screenings.

After exhausting her administrative remedies, Witcher filed a suit for judicial review in the district court of Travis County. *See* Gov't Code § 2001.176. Witcher alleged, and the district court ultimately found, that (1) an enforced suspension of Witcher's license is arbitrary and capricious in light of the facts found by the Board and its conclusions of law, (2) the Board used an unwritten policy ("reciprocal-sanctions policy") to impose an enforced suspension on Witcher's license, and (3) the use of the reciprocal-sanctions policy was arbitrary and capricious, resulted from improper ad hoc rulemaking, and violated the formal rulemaking requirements in the Administrative Procedure Act (APA) and the TPA. *See id.* § 2001.174(2) (specifying when trial court must reverse and remand in suit for judicial review); *see also id.* §§ 2001.021-.041 (governing agency rulemaking); Tex. Occ. Code §§ 554.051-.057 (prescribing Board's rulemaking authority). The trial court did not disturb any of the Board's findings of fact and conclusions of law (which were unchallenged), but the court reversed the portion of the final order imposing an indefinite enforced suspension of Witcher's license. The court ordered the cause remanded to the Board to determine an appropriate sanction consistent with the court's findings but limited the proceedings on remand

7

to the established record and the Board's affirmed fact findings and conclusions of law. *See* Gov't Code § 2001.174(2) (governing judicial review of agency decisions).

On appeal, the Board contends that the reciprocal sanction imposed in Witcher's case was not arbitrary and capricious because the Board has the exclusive authority to impose penalties and the sanction imposed was (1) within the range of sanctions authorized in the TPA, (2) consistent with statutory provisions that automatically deny licensing to new applicants who are subject to an active suspension in another state, and (3) consistent with the Board's policy, practice, and precedent of imposing reciprocal sanctions on Texas licensees who have been disciplined by other states.

## DISCUSSION

In addition to having the authority to discipline a pharmacist for acts violating Texas laws and federal law applicable in Texas, the Board may also discipline pharmacists who have been disciplined by pharmacy regulatory boards in other states if the pharmacist was disciplined for conduct that would violate the TPA. *See* Occ. Code § 565.001(a)(16). If a pharmacist is found to have committed violations in another state that are substantially equivalent to Texas violations, the Board has available to it the same disciplinary options in regard to limiting a pharmacist's practice as it would have for a violation committed in Texas. *See id.* § 565.051. Those options include revocation, enforced suspension, probated suspension, and license restrictions. *See id.* Although the Board may consider an ALJ's recommendation regarding the sanction to be imposed, the Board retains discretion to determine the appropriate sanction. 22 Tex. Admin. Code § 281.60(b) (2014) (Tex. State Bd. of Pharmacy, General Guidance); *cf. Sears v. Texas State Bd. of Dental Exam'rs*,

8

759 S.W.2d 748, 751 (Tex. App.—Austin 1988, no writ) ("The agency is charged by law with discretion to fix the penalty when it determines that the statute has been violated.").

In selecting the appropriate sanction, the Board has formally promulgated rules setting forth guidelines to be considered in assessing sanctions for violations of the TPA. Those guidelines specify that "[t]he ultimate purpose of disciplinary sanctions is to protect and inform the public, deter future violations, offer opportunities for rehabilitation, if appropriate, punish violators, and deter others from violations." 22 Tex. Admin. Code § 281.60(c). The guidelines are further "intended to promote consistent sanctions for similar violations." *Id.* Included in the analytical framework guiding disciplinary matters is section 281.62, a rule that prescribes several aggravating and mitigating factors that the Board may consider in assessing the appropriate disciplinary penalty.[3]

---

[3] Rule 281.62 provides:

The following factors may be considered in determining the disciplinary sanctions imposed by the board if the factors are applicable to the factual situation alleged. ...

(1) Aggravation. The following may be considered as aggravating factors so as to merit more severe or more restrictive action by the board:
　　(A) patient harm and the severity of patient harm;
　　(B) economic harm to any individual, entity, or the environment, and the severity of such harm;
　　(C) increased potential for harm to the public;
　　(D) attempted concealment of the conduct which serves as a basis for disciplinary action under the Act;
　　(E) premeditated conduct which serves as a basis for disciplinary action under the Act;
　　(F) intentional conduct which serves as a basis for disciplinary action under the Act;
　　(G) motive for conduct which serves as a basis for disciplinary action under the Act;
　　(H) prior conduct of a similar or related nature;
　　(I) disciplinary actions taken by any regulatory agency of the federal

9

Although the Board adopted the ALJ's finding that the mitigating factors in Witcher's case

government or any state;

(J) prior written warnings or written admonishments from any government agency or official regarding statutes or regulations pertaining to the conduct which serves as a basis for disciplinary action under the Act;

(K) violation of a board order;

(L) failure to implement remedial measures to correct or mitigate harm from the conduct which serves as a basis for disciplinary action under the Act;

(M) lack of rehabilitative potential or likelihood for future conduct of a similar nature;

(N) relevant circumstances increasing the seriousness of the conduct which serves as a basis for disciplinary action under the Act; and

(O) circumstances indicating intoxication due to ingestion of alcohol and/or drugs.

(2) Extenuation and Mitigation. The following may be considered as extenuating and mitigating factors so as to merit less severe or less restrictive action by the board:

(A) absence of potential harm to the public;

(B) self-reported and voluntary admissions of the conduct which serves as a basis for disciplinary action under the Act;

(C) absence of premeditation to commit the conduct which serves as a basis for disciplinary action under the Act;

(D) absence of intent to commit the conduct which serves as a basis for disciplinary action under the Act;

(E) absence of prior conduct of a similar or related nature;

(F) absence of disciplinary actions taken by any regulatory agency of the federal government or any state;

(G) implementation of remedial measures to correct or mitigate harm from the conduct which serves as a basis for disciplinary action under the Act;

(H) rehabilitative potential;

(I) prior community service and present value to the community;

(J) relevant circumstances reducing the seriousness of the conduct which serves as a basis for disciplinary action under the Act;

(K) relevant circumstances lessening responsibility for the conduct which serves as a basis for disciplinary action under the Act; and

(L) treatment and/or monitoring of an impairment.

22 Tex. Admin. Code § 281.62 (2014) (Tex. State Bd. of Pharmacy, Aggravating and Mitigating Factors).

outweighed the aggravating factors, it nonetheless imposed an indefinite enforced suspension of Witcher's license coterminous with the suspension of her North Carolina license.

It is undisputed that, under the TPA, the Board had the authority to discipline Witcher and to impose an enforced suspension of her license. The overarching issue in this appeal, however, is whether the particular sanction imposed—enforced suspension of Witcher's license concurrently with the suspension of her North Carolina license—resulted from the improper application of a "rule" as that term is defined in the APA. *See* Tex. Gov't Code § 2001.003(6) (defining "rule" for purposes of APA). A rule that is not properly promulgated under mandatory APA procedures is invalid, *see El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n*, 247 S.W.3d 709, 714 (Tex. 2008), and an agency decision based on an invalid rule must be reversed and remanded to the agency if substantial rights of the appellant have been prejudiced thereby, *see* Gov't Code § 2001.174(2) (specifying when trial court must reverse and remand agency decision). Because the Board's action in this case undeniably affected Witcher's substantial rights, we focus our analysis on whether the Board applied an improperly promulgated "rule" within the meaning of the APA.

The Board does not dispute that, in the present case, it employed what it characterized as a "non-binding" policy, practice, or precedent of imposing reciprocal sanctions on Texas licensees who have been disciplined by licensing authorities of other states if the conduct would have been sanctionable if committed in Texas. It is further undisputed that the Board did not adopt this policy, practice, or precedent in accordance with the APA's formal rulemaking procedures. The Board contends, however, that no matter how the reciprocal-sanctions policy is characterized, it was not required to comply with the APA's rulemaking procedures because the policy is not a "rule" within

11

the meaning of the APA but rather is a "statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures." *See* Gov't Code § 2001.003(6)(c) (excluding such statement from APA's definition of "rule"). The Board asserts that it has the authority to develop internal practices intended to promote consistency in the assessment of administrative penalties and that the reciprocal-sanctions policy furthers that goal. Alternatively, the Board asserts that it was entitled to adopt the policy as an ad hoc rule because the Board did not have sufficient experience with the issue of suspended pharmacists to develop a "hard and fast rule." *See City of El Paso v. Public Util. Comm'n of Tex.*, 883 S.W.2d 179, 188-89 (Tex. 1994) (observing that agency rule may be adopted outside formal rulemaking procedures in limited circumstances including novel situations in which agency is inexperienced).

Witcher contends, however, that the policy falls squarely within the APA's definition of a rule, was not properly promulgated under the APA, and does not qualify for any recognized exception to the requirement of formal rulemaking. *See, e.g.*, *id.* (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 202-03 (1947), as recognizing that agency has discretion to proceed on ad hoc or "case-by-case" basis when issue is novel to agency or so specialized and varying as to be impossible of capture within any general rule); *see also Southwestern Bell Tel. Co. v. Public Util. Comm'n of Tex.*, 745 S.W.2d 918, 926 (Tex. App.—Austin 1988, writ denied) (recognizing ad hoc rulemaking can be appropriate to flesh out new statute or rule). Witcher also asserts that, absent the application of a rule, the Board's chosen sanction is arbitrary and capricious because, among other things, there is no rational relationship between the facts found by the Board and the sanction imposed. *See City of El Paso*, 883 S.W.2d at 184 (agency decision is arbitrary if agency fails to consider statutorily

12

required factor, considers irrelevant factor, or weighs only relevant factors but reaches unreasonable result). Stated another way, Witcher contends that absent the application of a valid rule mandating a reciprocal sanction, such a sanction is unreasonable considering both her individual circumstances and prior Board precedent involving pharmacists who engaged in significantly more egregious substance-abuse conduct but who received probated five-year sentences upon establishing fitness to practice, as she has in this case. *See* Agreed Board Order #G-09-025 (May 5, 2010) (pharmacist who stole drugs from pharmacy, abused legal and illegal drugs, and violated terms of monitoring agreement with TxPRN given one-year active suspension followed by five-year probated suspension if fitness to practice established by end of active suspension); Agreed Board Order #G-10-020 (June 7, 2011) (involving similar facts and sanctions); Agreed Board Order #B-08-038-A (Aug. 11, 2010) (pharmacist who stole controlled substances given limited active suspension followed by five-year probated suspension if fitness to practice established by end of active suspension).

The APA defines a "rule" as follows:

"Rule":

(A)     means a state agency statement of general applicability that:
      i.     implements, interprets, or prescribes law or policy; or
      ii.    describes the procedure or practice requirements of a state agency;

(B)     includes the amendment or repeal of a prior rule; and

(C)     does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.

Gov't Code § 2001.003(6). This Court has held that, to constitute a "rule" under this definition, "an agency statement interpreting law must bind the agency *or otherwise represent its authoritative position in matters that impact personal rights*." *Texas Dep't of Transp. v. Sunset Transp., Inc.*, 357 S.W.3d 691, 703 (Tex. App.—Austin 2011, no pet.) (emphasis added); *see Texas Dep't of Pub. Safety v. Salazar*, 304 S.W.3d 896, 905 (Tex. App.—Austin 2009, no pet.) ("Agency statements that 'have no effect on private persons' are not considered rules.") (quoting *Brinkley v. Texas Lottery Comm'n*, 986 S.W.2d 764, 770 (Tex. App.—Austin 1999, no pet.)); *Combs v. Entertainment Publ'ns Inc.*, 292 S.W.3d 712, 722 (Tex. App.—Austin 2009, no pet.) (emphasizing that legal interpretation in Comptroller's letters would bind agency employees and "unambiguously express[ed] an intent to apply this interpretation . . . in all future cases" involving private parties in similar circumstances); *Texas Alcoholic Beverage Comm'n v. Amusement & Music Operators of Tex. Inc.*, 997 S.W.2d 651, 658 (Tex. App.—Austin 1999, pet. dism'd w.o.j.) (agency memoranda to its law-enforcement agents held to constitute "rules" on that record where there was evidence that agents "*not only intend to enforce, but have enforced administrative sanctions*" in accordance with memoranda (emphasis added)); *see also Brinkley*, 986 S.W.2d at 770 (observing that agency advisory opinion regarding applicable law would have no legal effect "absent a statute that so provides *or some attempt by the agency to enforce its statement against a private person*" (emphasis added)). "Although the distinction between a 'rule' and an agency statement that concerns only 'internal management or organization . . . and not affecting private rights' may sometimes be elusive, the core concept is that the agency statement must in itself have a binding effect on private parties." *Slay v. Texas Comm'n on Envtl. Quality*, 351 S.W.3d 532, 546 (Tex. App.—Austin 2011, pet. denied). In that regard, a

14

distinction exists between nonbinding evaluative guidelines that take into consideration case-specific circumstances—which have been held not to be a rule—and policies that dictate specified results without regard to individual circumstances, which have been held to be a rule. *Compare id.* at 538-39, 548 (agency's guidelines used to evaluate environmental violations for purposes of recommending penalty based on individual circumstances was not "rule" under APA), *with El Paso Hosp. Dist.*, 247 S.W.3d at 714 (by establishing cut-off date for accepting data to determine hospitals' Medicaid reimbursement rate, agency established "rule" within meaning of APA) *and Entertainment Publ'ns*, 292 S.W.3d at 721("[T]he Comptroller's statements in the March and April 2008 letters that the Comptroller will uniformly regard brochure-fundraising firms as the sellers and nonprofit entities as the sellers' agents, without regard to the individual factors considered under the Comptroller's previous guidelines, are 'generally applicable' statements for purposes of the APA.").

The Board's disciplinary order in this case, including the findings of fact and conclusions of law, leave little doubt that the Board's reciprocal-sanctions policy is a statement implementing, interpreting, or prescribing the agency's policy that affects private rights and has implications beyond the parties to the underlying proceeding. It is, therefore, a rule within the meaning of the APA. *See El Paso Hosp. Dist.*, 247 S.W.3d at 714 (stating that "general applicability" under APA references agency statements that affect interests of public at large such that they cannot be given effect of law without public input); *see also CenterPoint Energy Entex v. Railroad Comm'n of Tex.*, 213 S.W.3d 364, 369 (Tex. App.—Austin 2006, no pet.) ("Ad hoc rulemaking occurs when the agency makes a determination that has implications beyond the instant parties . . . .").

In the final agency order in Witcher's disciplinary proceeding, the Board explained its reciprocal-sanctions policy in the following terms of general applicability:

> A concurrent suspension is the appropriate disciplinary sanction because the Board can not [sic] allow pharmacists to work in Texas who have had their practice ability taken away in another state. The integrity of all states' licensing systems is compromised if pharmacists are allowed to jump from state to state in order to avoid disciplinary action. The Board has a duty to respect the public acts of another state board. This promotes uniformity and consistency in regulation among the states.

As articulated, the Board's reciprocal-sanctions policy applies not just to Witcher but to all pharmacists licensed in more than one state. The order essentially states that the Board is *duty-bound* to impose reciprocal disciplinary action without regard to any other factor that might be considered in individual circumstances.[4]

The general applicability of the Board's policy is underscored by the passage that followed its articulation, which further demonstrates that the reciprocal-sanctions policy was applied without regard to the specific circumstances in Witcher's case:

> Although the ALJ's recommendation [of a five-year probated sentence with monitoring] may satisfy concerns the Board would have regarding [Witcher's] impairment, it would not address the fact that [Witcher] is barred from practicing pharmacy by a regulatory board of another state for conduct substantially equivalent to conduct described under the Texas Pharmacy Act.

---

[4] The dissent makes much of the fact that "the Board's representative" (i.e., a staff member) argued to the Board that it was not *required* to suspend Witcher. But in an administrative hearing, the agency's staff is simply like any other party in the proceeding, and statements by a staff member are not deemed to be statements of the agency board or commission. Here, as in every contested case, the Board spoke through its order.

16

Moreover, contrary to the stated rationale for the reciprocal-sanctions policy, the Board adopted the ALJ's finding that Witcher was "not seeking to evade compliance with the reinstatement provisions of the North Carolina order, but only to avoid the considerable financial hurdles she would face to achieve that compliance." Significantly, although the Board found that requiring Witcher to participate in the NCPRN program as a precondition to having the suspension of her North Carolina license lifted is not reasonably possible given her current circumstances, it nonetheless ordered her to do just that.[5] These findings and conclusions support the construction of the Board's policy as a rule that applies irrespective of the circumstances in an individual case.

The general applicability of the reciprocal-sanctions policy and its impact on the interests of the public at large is further evident from the evidence and testimony admitted at the hearing before the ALJ. At the evidentiary hearing, Carol Fisher, the Board's Director of Enforcement, testified that reciprocal discipline is the "Board's policy" and the "standard sanction." As the source of the policy, Fisher cited the case of *In re Nealy*, in which the Board had previously

---

[5] The Board adopted the ALJ's finding that it would not be "feasible" for Witcher to comply with the NCPRN precondition to reinstatement. "Feasible" is defined to mean "capable of being done . . . possible of realization," "capable of being managed, utilized or dealt with successfully," and "reasonable, likely." *Webster's Third New Int'l Dictionary: Unabridged* 831 (2002). "An agency's decision is arbitrary or results from an abuse of discretion if the agency . . . weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result." *City of El Paso v. Public Util. Comm'n of Tex.*, 883 S.W.2d 179, 184 (Tex. 1994). Thus, even if we were to agree with the Board that its policy is not a rule under the APA, the imposition of a requirement that the Board itself found to be virtually impossible to satisfy would suggest that the Board's decision is arbitrary and capricious. If the Board applied a properly promulgated rule dictating such a consequence, however, it would be more difficult to conclude that the sanction lacked a rational basis. *Cf. Pierce v. Texas Racing Comm'n*, 212 S.W.3d 745, 753-54 (Tex. App.—Austin 2006, pet. denied) (agency did not abuse its discretion in applying zero-tolerance policy when racehorse tested positive for banned substance and unchallenged "guidelines" mandated loss of purse for type of violation involved).

articulated its reciprocal-sanctions policy in the same terms of general applicability in a particularly egregious case in which a pharmacist who received his Texas license via reciprocity with Louisiana had a long history of violating the pharmacy laws of both states. *See Texas State Bd. of Pharmacy v. Nealy*, Board Order #N-03-005, SOAH Docket No. 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 (2005). After nearly 15 years of suspensions, revocations, reinstatements, and continuing violations, the Board suspended Nealy's license concurrently with an active suspension of his Louisiana license, and stated:

> In previous cases with similar facts, the Board has typically imposed disciplinary action mirroring the action by another state board of pharmacy. The policy the Board considers in taking such action is to prevent licensees from escaping disciplinary action in one state by coming to Texas. If another state board of pharmacy has prohibited a pharmacist from practicing, so long as there is no evidence that a pharmacist has not been afforded due process in the other state, *the Board believes it is sound policy for the pharmacist to be prevented from practicing in Texas until the pharmacist resolves the restrictions on his license in the other state*. Otherwise a pharmacist would suffer no negative consequences from violations of the law in another state. Other pharmacists with licenses in Texas and in another state might assume that similar violations would not merit serious consideration by the Board.

*Id.* (emphasis added). Although the factual circumstances and extensive disciplinary history in *Nealy* would have justified the imposition of a reciprocal sanction without regard to the enunciated policy, the Board made a point of articulating the policy itself as the basis for imposing a reciprocal sanction. As the Board's staff noted in its written closing argument in Witcher's case: "It is clear from the order [in *Nealy*] that [the Board] based the selection of the sanction on the licensee's disciplinary status in the other state and not upon his prior disciplinary history with [the Board]."

Despite the stark disparity in individual circumstances between Witcher's case and the facts in *Nealy*, Fisher testified that she did not expect that the Board would do anything

18

differently from what it had done in *Nealy* because the fact of an active suspension of Witcher's North Carolina license was dispositive of the appropriate sanction. Fisher repeatedly testified to the effect that individual circumstances do not matter. In this regard, the reciprocal-sanctions policy is analogous to agency policies that this Court in *Combs v. Entertainment Publications, Inc.*, 292 S.W.3d 712 (Tex. App.—Austin 2009, no pet.), and the supreme court in *El Paso Hospital District v. Texas Health & Human Services Commission*, 247 S.W.3d 709 (Tex. 2008), found to be rules under the APA.

In *Entertainment Publications*, a brochure-fundraising firm that contracted with tax-exempt schools to sell merchandise and food products to raise money for student groups challenged an agency policy that would require it to collect and remit tax on its sale of those goods to the schools. *Entertainment Publ'ns*, 292 S.W.3d at 715. Historically, the brochure-fundraising firm had structured its transactions with its customers to take advantage of the exemption to avoid collecting sales taxes on its initial sale of goods to those customers. *Id.* at 716. The tax-exempt customers, in turn, could use a different provision of the tax code to avoid collecting sales tax on the items when sold to the ultimate consumer, but only if the tax-exempt customer was considered to be the "seller" of the merchandise. *Id.* To determine who was the seller in such transactions, the Comptroller had historically applied several criteria to analyze the actual substance of the relevant transaction. That policy had been reflected in an earlier letter ruling, which a representative of the Comptroller's office testified accurately stated the Comptroller's policy as to brochure fundraising at the time it was issued. However, the Comptroller subsequently issued two letters in which the

19

policy was changed from the factor-based approach to a bright-line rule that the fundraising firm would always be considered the "seller."

Like the Board in the present case, the Comptroller in *Entertainment Publications* argued that the letters were merely advisory opinions, not binding instructions, concerning her future enforcement of the sales tax. This Court disagreed, holding:

> There is no question in this case that the [Comptroller's] March and April 2008 letters are statements implementing, interpreting, or prescribing law or policy. As the Comptroller's witness testified, these letters communicated the Comptroller's intention to apply section 151.024 in all cases involving brochure fundraising firms, thereby interpreting the tax code to mean that such firms are, for purposes of collecting and remitting sales tax, always the "sellers" of the taxable items.

*Id.* at 721. The Court further concluded that the policy was "generally applicable" within the meaning of the APA because

> the Comptroller's statements in the March and April 2008 letters that the Comptroller will uniformly regard brochure-fundraising firms as the sellers and nonprofit entities as the sellers' agents, without regard to the individual factors considered under the Comptroller's previous guidelines, are "generally applicable" statements for purposes of the APA. These interpretations apply not only to [the appellee] and the tax-exempt groups with which it conducts business, but to all brochure-fundraising firms engaging in business across the state.

*Id.* at 721-22.

As in *Entertainment Publications*, the present case involves a policy that establishes a bright-line rule that is applicable without regard to individual circumstances that could be considered under section 281.62 of the Board's rules. In addition, both the terms of the final order

and the testimony by the Board's Enforcement Director during the disciplinary proceeding reveal the Board's intent to apply the policy not just to Witcher but also prescriptively to others.

In *El Paso Hospital District*, the Texas Supreme Court considered whether the Health & Human Services Commission's (HHSC) data-collection method for calculating prospective Medicaid inpatient service rates was an agency rule as defined by the APA. 247 S.W.3d at 711. In determining the reimbursement rate, HHSC employed a policy of accepting data from claims paid only through a specified date in the year following the base year. *Id.* at 713. Claims for all patients admitted during the base year, but not paid by the cut-off date, were not included in determining the prospective reimbursement rates. *Id.* This policy resulted in the exclusion of data for services actually performed in the base year if the claims were not paid before the cut-off date. *Id.* The supreme court rejected HHSC's argument that the cut-off date was not a rule itself but rather an interpretation of its own base-year rule. *Id.* at 714. The court concluded that the cut-off rule fell squarely within the APA's definition of a rule because (1) it implemented HHSC's policy and described its data-collection procedure and (2) it applied to all hospitals receiving reimbursement for inpatient Medicaid services. *Id*.

The court observed that HHSC's rules provided that it would use a base year, defined as "[a] 12-consecutive-month period of claims data," to calculate the Hospitals' rates and that the effect of the cut-off date was to modify the base-year rule by controlling the data HHSC would use from that base year. *Id.* at 714 (quoting 1 Tex. Admin. Code § 355.8063(b)(5)). The court also determined that the cut-off date did not concern the agency's internal management or organization but rather affected the Hospitals' private rights. *Id.* at 714-15. Consequently, the court said, the

21

Hospitals were "entitled to have their prospective reimbursement rates determined according to the formula set out in HHSC's rules." *Id.* Because the cut-off date was a rule that had not been properly promulgated, it was found to be invalid. *Id.*

In the present case, the reciprocal-sanctions policy the Board cited in its final order is analogous to the cut-off date in *El Paso Hospital District* in that it establishes one of the aggravating factors in section 281.62 of the Board's rules—specifically, subsection (1)(I) pertaining to disciplinary actions taken by any state—as an outcome-determinative factor. Although use of the factors in section 281.62 is discretionary, the elevation of one of those factors to case-dispositive status either constitutes a modification of that rule or the establishment of a new rule.

The Board argues that the reciprocal-sanctions policy is like the evaluative penalty guidelines this Court concluded did not constitute a rule in *Slay v. Texas Commission on Environmental Quality*, 351 S.W.3d 532, 548 (Tex. App.—Austin 2011, pet. denied). That case—unlike the present case, *Entertainment Publications*, and *El Paso Hospital District*—involved guidelines that required evaluation of case-specific factors in formulating a recommendation for an appropriate sanction. *See id.* at 537-42. Although the guidelines considered in *Slay* were intended to achieve a level of consistency when similar circumstances were present, they did not require a specific result in all cases. There was no per se penalty dictated by the guidelines; rather, the agency's staff was required to use a formalized analytical structure to evaluate the case, but the structure did not direct a particular outcome. *Id.* at 546-48. That is the opposite of the circumstances in the present case.

22

Considering the foregoing, we conclude that construing the Board's policy as a "rule" is consistent with the supreme court's instruction that we consider the intent of the agency, the prescriptive nature of the policy, and the context in which the agency statement was made. *Cf. Entertainment Publ'ns*, 292 S.W.3d at 722 (citing *Texas Educ. Agency v. Leeper*, 893 S.W.2d 432, 443 (Tex. 1994)). The Board has unambiguously expressed its intent to apply the reciprocal-sanctions policy to all Texas pharmacists licensed to practice in other states, regardless of whether the particular circumstances of each case might result in a different sanction if the aggravating and mitigating factors in agency rule 281.62 were considered. *Cf.* 22 Tex. Admin. Code § 281.62 (2014) (Tex. State Bd. of Pharmacy, Aggravating and Mitigating Factors) (listing factors that "may be considered in determining the disciplinary sanctions imposed by the board if the factors are applicable to the factual situation alleged"); *cf. also Entertainment Publ'ns*, 292 S.W.3d at 722 (construing Comptroller's letters that changed policy from "seller versus agent-for-seller" analysis to bright-line standard). Without doubt, the Board's policy "represent[s] its authoritative position in matters that impact personal rights."[6] *See Sunset Transp., Inc.*, 357 S.W.3d at 703.

---

[6] After issuing its final order in Witcher's case, the Board, using notice-and-comment rulemaking procedures, formally promulgated a rule requiring the imposition of reciprocal sanctions when a Texas licensee has been disciplined by the regulatory board of another state:

§ 281.67. Sanctions for Out-of-State Disciplinary Actions

(a)      When determining the appropriate sanction for a disciplinary action taken by a regulatory board of another state under § 565.001(a)(16), § 565.002(a)(13), or § 568.003(a)(13), the board has determined that the following shall be applicable for all types of licensees and registrants for such licenses and registrations issued by the board.

(1)      If the other state's disciplinary action resulted in the license or

Furthermore, having previously articulated the reciprocal-sanctions policy in *Nealy*

and as it is rearticulated in Witcher's case, the Board is not entirely free to disregard it in future

cases. Although an "'agency is not bound to follow its decisions in contested cases in the same way

that a court is bound by precedent.' . . . [,] an agency is required by courts to 'explain its reasoning

when it "appears to the reviewing court that an agency has departed from its earlier administrative

policy or there exists an apparent inconsistency in agency determinations."'" *Austin Chevrolet, Inc.*

---

registration being restricted, suspended, revoked, or surrendered, the appropriate sanction shall be the same as the sanction imposed by the other state, such that the licensee or registrant has the same restriction against practice in Texas.

(2)     If the license or registration is subject to any other type of disciplinary sanctions, the appropriate sanction shall be equivalent to or less than that imposed by the other state unless contrary to board policy.

(b)     The sanctions imposed by this section can be used in conjunction with other types of disciplinary actions, including administrative penalties, as outlined in this chapter.

(c)     When a licensee or registrant has additional violations of the Texas Pharmacy Act, the board shall consider imposing additional more severe types of disciplinary sanctions, as deemed necessary.

22 Tex. Admin. Code § 281.67 (2014) (Texas State Bd. of Pharmacy, Sanctions for Out-of-State Disciplinary Actions). In adopting that rule, the Board stated that the addition of section 281.67 "*clarifies* the sanctions for disciplinary actions taken by a regulatory board of another state." 37 Tex. Reg. 4046 (June 1, 2012) (emphasis added) (adopting new section 281.67 of Board's rules); 37 Tex. Reg. 2145 (Mar. 30, 2012) (emphasis added) (proposing new section 281.67). This statement of the formal rule as a "clarification" might be construed to further support the prescriptive nature and general applicability of the reciprocal-sanctions policy prior to its formal adoption as a rule. But even if it is not, it at least demonstrates that the policy was capable of being captured in a rule, thus rendering one of the recognized exceptions to the APA's formal rulemaking procedures inapplicable. *See City of El Paso*, 883 S.W.2d at 188-89 (observing that agency rule may be adopted outside formal rulemaking procedures in limited circumstances including when issue is so specialized and varying as to be impossible of capture within general rule).

*v. Motor Vehicle Bd.*, 212 S.W.3d 425, 438 (Tex. App.—Austin 2006, pet. denied) (quoting *Flores v. Employees Retirement Sys. of Tex.*, 74 S.W.3d 532, 533-34 (Tex. App.—Austin 2002, pet. denied)).[7]

The foregoing analysis leads us to conclude that the Board's informally announced reciprocal-sanctions policy constitutes an agency "rule" as that term is defined in the APA. It is well established that a rule that is not adopted in accordance with the APA's rulemaking procedures is typically invalid. *El Paso Hosp. Dist.*, 247 S.W.3d at 715 (citing Gov't Code § 2001.035(a)). In exceptional cases, however, an agency may choose to formulate and enforce a general requirement through a decision in a particular case. *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 255 (Tex. 1999). Adjudicative rulemaking has been recognized as appropriate in limited circumstances in which an agency is confronted with (1) an issue of first impression, (2) a new or amended statutory scheme or administrative rules, or (3) an issue that cannot be adequately captured within the bounds of a general rule because the problem is so specialized and varying in nature. None of those circumstances is present in this case.[8] Accordingly, the rule embodied in the

---

[7] In light of the facts the Board adopted in Witcher's case and the Board's acknowledgment that the underlying rationale of the policy is not strictly applicable to Witcher's individual circumstances, it is difficult to conceive of a scenario in which the Board would not apply the policy. At oral argument, the only scenario the Board's counsel could hypothesize was one for which no discipline would be authorized under the TPA in the first instance—that is, counsel suggested that the Board would not impose reciprocal discipline if a pharmacist's license was suspended in another state for something absurd, like wearing a red t-shirt. However, such conduct would not be sanctionable under the TPA, and accordingly the reciprocal-sanctions policy would not be implicated. *See* Tex. Occ. Code § 565.001 (providing grounds for disciplining Texas licensee).

[8] We are not persuaded by the Board's assertion that Witcher's case presented a novel issue with which the Board was unfamiliar. The case of *In re Nealy*, which references the existence of other cases involving reciprocal sanctions, refutes such a claim, as does Fisher's testimony.

25

reciprocal-sanctions policy is invalid and should not have been applied in Witcher's case. The inclusion of general language in the final order that the sanction imposed "best reflects the Board's determination of the seriousness of the violation and is the best sanction to deter future violations" neither negates the rule's obvious application in Witcher's case nor suggests an alternative basis for the Board's decision. The trial court did not err in reversing the Board's order and remanding the cause to the Board for reconsideration of the appropriate sanction under properly promulgated rules.

## ON MOTION FOR REHEARING

In its initial appellate briefing, the Board's principal arguments were that (1) the Board's order did not contain or adopt a "rule" at all, and (2) if it did, the rule fell within one of the narrow circumstances in which ad hoc rulemaking is permitted. The Board has now filed a motion for rehearing raising wholly new issues and arguments. Although we conclude that the motion for rehearing does not require that we alter the substance of our original opinion, we add this supplemental opinion to address some of the new arguments raised in the motion.

It is undisputed that, at all relevant times, there was no statute or regulation that mandated the imposition of an identical reciprocal sanction for a Texas licensee whose out-of-state pharmacist's license had been suspended or revoked by another state. Rather, the Board's formally adopted regulations provided a number of aggravating and mitigating factors to be considered in determining the appropriate disciplinary sanction in an individual disciplinary proceeding. *See* 22 Tex. Admin. Code § 281.62 (providing evaluative factors in cases involving non-criminal conduct). The disciplinary action taken by another jurisdiction was but one of those factors. *Id.* § 281.62(1)(I). The central issue in this case is whether the Board improperly engaged in ad hoc

26

rulemaking (also referred to as adjudicative rulemaking) when it applied a general policy that requires, as a standard sanction, the imposition of a reciprocal sanction without regard to any other factor identified in the applicable regulation and without regard to whether the rationale underlying the policy is actually implicated by the affected pharmacist's individual circumstances.

An ad hoc rule is a general statement of law or policy that is made in the context of a contested case and the impact of which will extend to persons beyond those who are parties to the proceeding at hand.

> [T]he Texas Supreme Court and the Austin Court of Appeals have both recognized that an agency may formulate a rule for the first time within a contested case proceeding. Such act of rulemaking has been labeled ad hoc adjudication or ad hoc rulemaking or case by case rulemaking.
> . . . [A]n ad hoc "rule" is not a mere finding of fact or interpretation of a statutory term but it is an agency formulating policy subject to its delegated rule making power that sets forth a standard that is binding on the parties before the agency.

2 Ronald L. Beal, *Texas Administrative Practice and Procedure* § 10.1 at 10-2 to 10-3 (Supp. 6/2009) (footnotes omitted).

> While ad hoc rulemaking is an exercise of legislative power, the rules are developed by the "common law" method [i.e., within a contested case] that then imposes the rules by stare decisis and precedent. While the particular contested case order which adopted an ad hoc rule is only directly applicable to those to whom it has been applied, the agency will be required to apply it to future parties with substantially similar conditions.

1 Beal, *supra* § 2.4 at 2-58 (Supp. 6/2010).

27

The present case presents a quintessential example of ad hoc rulemaking. Pursuant to the APA's notice-and-comment rulemaking procedures, the Board had formally adopted a rule setting forth 15 aggravating factors and 12 mitigating factors that could be considered in determining the appropriate sanction to be assessed against a pharmacist who had violated Board rules. *See* 22 Tex. Admin. Code § 281.62. Nonetheless, in this case the Board's contested-case order stated that, as a matter of policy, one of the aggravating factors listed in Rule 281.62(1) would be dispositive in all cases in which that factor was present, regardless of the presence or absence of any of the other 26 enumerated factors. *Id.* at 281.62(1)(I). This statement was announced as a matter of general policy. This is the essence of an ad hoc rule. *See* 1 Beal, *supra* at § 2.4 (Supp. 6/2010); Ron Beal, *Ad Hoc Rulemaking in Texas: The Scope of Judicial Review*, 42 Baylor L. Rev. 459, 461-67 (1990); Ron Beal, *Ad Hoc Rulemaking: Texas Style*, 41 Baylor L. Rev. 101, 102-07 (1989); *see also* Ron Beal, *The APA and Rulemaking: Lack of Uniformity within a Uniform System*, 56 Baylor L. Rev. 1, 13-18 (2004).

The main thrust of the Board's motion for rehearing is that the Board (and, by extension, any administrative agency) has virtually unrestricted discretion to engage in ad hoc rulemaking. In advancing this position, which was not previously made to this Court, the Board relies largely on two arguments, which were likewise not previously made to this Court. First, the Board asserts that certain statements in *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248 (Tex. 1999), in which the Texas Supreme Court recognized severe limitations on an agency's authority to engage in ad hoc rulemaking, are mere "dictum" that can safely be ignored. Second, the Board asserts that, in any event, the holding in *Rodriguez* was undercut if not overturned—sub silentio—by

28

the supreme court's later opinion in *Railroad Commission of Tex. v. WBD Oil & Gas Co.*, 104 S.W.3d 69 (Tex. 2003). We disagree on both counts.

### *Rodriguez v. Service Lloyds Ins. Co.*

The supreme court in *Rodriguez* emphasized the importance of requiring agencies to adhere to the notice-and-comment rulemaking procedures mandated by the APA: "A presumption favors adopting rules of general applicability through the formal [notice-and-comment] rulemaking procedures as opposed to administrative adjudication. Allowing an agency to create broad amendments to its rules through administrative adjudication rather than through its rulemaking authority undercuts the Administrative Procedure Act (APA)." 997 S.W.2d at 255. The court held that agencies could utilize ad hoc rulemaking *only in narrow circumstances*:

> *In exceptional cases*, an agency may choose to formulate and enforce a general requirement through a decision in a particular case. An agency may do this when using the [notice-and-comment] rulemaking procedure would frustrate the effective accomplishment of the agency's functions. Adjudicative rulemaking may be appropriate, for example, *when the agency is construing a new rule* or when a dispute deals with a problem that requires ad hoc resolution because *the issue cannot be captured within the bounds of a general rule*. The agency's discretionary choice to rely on adjudication is subject to judicial review and revision.

*Id.* (citations omitted) (emphases added). In recognizing stringent limitations on an agency's power to use ad hoc rulemaking, the *Rodriguez* court did not make new law and did not go out on a jurisprudential limb.[9] Rather, the court upheld *the plain language of the APA* as prescribing the

---

[9] *See, e.g.*, *SEC v. Chenery Corp.*, 332 U.S. 194, 202-03 (1947) (observing that agencies are less justified in resorting to ad hoc procedures in lieu of promulgating general rules, but recognizing that, to avoid "stultify[ing] the administrative process," ad hoc decision making would be warranted

method and manner by which a state agency can adopt generally applicable statements of law, policy, procedure, or practice. *See* Tex. Gov't Code §§ 2001.0225-.034 (governing agency rulemaking); *cf. generally Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 173, 199 (Tex. 2004) (holding that APA's plain language controls in absence of express conflict with agency's enabling statute or unless clear evidence exists of contrary legislative intent). An improperly adopted rule is voidable. Tex. Gov't Code § 2001.035(a).

In its motion for rehearing in the present case, the Board attempts to dismiss these holdings in *Rodriguez* as dictum. They are not. In *Rodriguez*, the Texas Workers' Compensation Commission had formally adopted a rule requiring that an initial impairment rating be disputed by the claimant within 90 days after the rating was assigned. 997 S.W.2d at 252. Over the years, however, the Commission had purported to create ad hoc exceptions to the 90-day deadline. *Id.* at 254-55. The claimant in *Rodriguez* sought to take advantage of those exceptions. The supreme court rejected the agency's ad hoc exceptions as improper, holding that the formally adopted rule would control:

---

in appropriate circumstances including reasonably unforseeable situations, inexperience with particular problems, or inability to capture problem within bounds of general rule); *Railroad Comm'n of Tex. v. Lone Star Gas Co.*, 844 S.W.2d 679, 689 (Tex. 1992) (noting that agency has "informed discretion" in making decision to proceed via rulemaking or ad hoc adjudication but stating that *rulemaking should be utilized* except "'[when] there is a danger that its use would frustrate the effective accomplishment of the agency's function"); *Amarillo Indep. Sch. Dist. v. Meno*, 854 S.W.2d 950, 958 (Tex. App.—Austin 1993, writ denied) ("exceptional cases" may arise in which "agency may justifiably choose, in its discretion to formulate and enforce a general requirement [ad hoc]" rather than by formal rulemaking, including construing new rule or statute or matter incapable of articulation as general rule); 1 Frank E. Cooper, *State Administrative Law* 177-85 (1965) (observing that legislature delegates rulemaking power to agency in expectation that it will ordinarily employ that power to formulate and adopt requirements of general applicability).

> Here, we see no reason to overturn the presumption favoring the fairness and public participation that accompany formal rulemaking under the APA. The 90-day Rule certainly is not new. In addition, the Commission could have easily formulated exceptions in the language of a general rule. In fact, the Commission appeals panels formulated their exceptions in the language of a general rule . . . .

*Id.* at 255 (citations omitted).

Thus, the *Rodriguez* opinion not only *announced* the standard by which courts should determine the validity of ad hoc rules, it specifically *applied* that standard in evaluating—and rejecting—the Commission's ad hoc exceptions. Far from being peripheral to the court's holding, the *Rodriguez* opinion's references to the exceptional circumstances needed to make ad hoc rulemaking permissible ("construing a new rule" or addressing an "issue [that] cannot be captured within the bounds of a general rule") were central to the court's decision. Accordingly, the relevant statements in *Rodriguez* were not dictum. *See* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 274 (2nd ed. 1995) (quoting Judge Posner's definition of "dictum" as "a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding . . . ." contained in *Sarnoff v. American Home Prods. Corp.*, 798 F.2d 1075, 1084 (7th Cir. 1986)). We therefore continue to be bound by the holdings in *Rodriguez*, which can only be read as affirming that ad hoc rulemaking is a narrow exception to the APA's mandate that agency rules be adopted through notice-and-comment rulemaking procedures.

### *Railroad Commission of Texas v. WBD Oil & Gas Co.*

The second major argument raised in the Board's motion for rehearing is that the supreme court's holding in *Rodriguez* described above was undercut by the court's later opinion in

*Railroad Commission of Tex. v. WBD Oil & Gas Co.*, 104 S.W.3d 69 (Tex. 2003). Even a casual reading of *WBD*, however, shows that it is inapplicable to the present case. The sole issue in *WBD* was whether field rules adopted by the Railroad Commission after a trial-type proceeding (which the supreme court held to be a contested case) could be challenged under section 2001.038 of the APA or instead had to be challenged through contested-case procedures. *See id.* at 74. Section 2001.038 provides that "[t]he validity or applicability of a rule . . . may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff." Tex. Gov't Code § 2001.038(a). The court held that the field rules at issue could not be challenged under section 2001.038 but had to be challenged through the procedure for challenging a contested-case order:

> Thus, as we read the APA, judicial review of orders adopting field rules should be the same as in other contested case decisions. . . .
> Accordingly, we conclude that Commission field rules adopted in a contested case like those involved here cannot be challenged in a declaratory judgment action under section 2001.038 of the APA.

*WBD*, 104 S.W.3d at 79. Nowhere in the supreme court's *WBD* opinion is ad hoc rulemaking mentioned. Nowhere in the opinion is *Rodriguez* cited, much less discussed or overruled. In short, ad hoc rulemaking was never an issue in *WBD*.

The procedural posture of the present case, on the other hand, is radically different. Here, Witcher ***did*** use contested-case procedures to challenge the Board's ad hoc rule. She timely filed a motion for rehearing with the Board, complaining of the ad hoc reciprocal-sanction rule.

32

When that was overruled, she timely filed a suit for judicial review, again complaining of the ad hoc rule. *See* Tex. Gov't Code §§ 2001.171, .174-76. The trial court agreed, ruling that "the Board's use of an unwritten policy to impose an enforced suspension of Ms. Witcher's license is 1) arbitrary and capricious, 2) improper ad-hoc rulemaking, and 3) a violation of the APA and Pharmacy Act's rulemaking requirements." Thus, as stated above, the dispositive issues in this appeal are (1) whether the Board's contested-case order applied an ad hoc "rule," and (2) if it did, whether the circumstances fall within one of the narrow exceptions in which ad hoc rulemaking is permitted. *WBD* does not control these questions.

Nonetheless, the Board appears to contend in its motion for rehearing that *WBD* stands for the proposition that (1) agencies generally have unqualified discretion to adopt rules either by notice-and-comment rulemaking or by ad hoc adjudication and (2) an agency statement that "implements, interprets, or prescribes law or policy" adopted ad hoc in an adjudicative proceeding can never be a statement of general applicability as required to meet the APA's definition of a "rule." *See* Tex. Gov't Code § 2001.003(6) (defining "rule" for purposes of APA). Neither of these broad propositions is supported by the applicable statutory schemes or the relevant jurisprudential environment.

We will not revisit the second proposition because our original opinion adequately explains our conclusion that the reciprocal-sanctions policy meets the APA's definition of a rule and we discern nothing in *WBD* that alters that conclusion.[10] Our discussion of the first proposition

---

[10] We reiterate our initial observations that the Board's disciplinary order included affirmative statements of general applicability that were prospective in operation and based on general policy considerations rather than Witcher's individual circumstances. *Cf. Combs*

33

proceeds from our conclusion that the reciprocal-sanctions policy is a rule that was not promulgated under the APA's mandatory rulemaking procedures before being applied to dictate the sanction imposed in Witcher's case.

In a nutshell, (1) the APA contains a statutory mandate governing agency adoption of rules of general applicability; (2) the Board's enabling statute, the TPA, contains no language that limits the APA's reach or expands the Board's rulemaking authority; and (3) to the extent the Board arguably has discretion to use its limited statutory adjudicatory authority to adopt ad hoc rules of general applicability, the facts of this case do not support the exercise (through any recognized or proffered exception to APA rulemaking) of any such discretion in contravention of the APA's plain language and the presumption favoring APA rulemaking.

*v. Entertainment Publ'ns Inc.*, 292 S.W.3d 712, 724 & n.8 (Tex. App—Austin 2009, no pet.) (agency not precluded from making individual determination, on case-by-case basis, but pronouncement of policy applicable to all similarly situated businesses without regard to individual circumstances constituted "rule" under APA). The evidence established that the Board considers a reciprocal sanction to be the "standard sanction." Moreover, and perhaps most importantly, the indefinite-suspension sanction the Board imposed against Witcher's Texas license is so at odds with the Board's fact findings as to be inexplicable without the application of an outcome-determinative factor not found in the enabling statute or governing regulations. Without resort to such a rule, the sanction imposed is not supported by basic underlying fact findings and the Board's own precedent. Further, in addition to espousing a general policy to justify the selection of a standard sanction in reciprocal disciplinary scenarios, the Board's decision only sets forth justifications or explanations that contradict its fact findings. The Board's motion for rehearing presents no reason for us to reconsider our prior holding that the reciprocal-sanctions policy meets the APA's definition of a "rule."

We do not read *WBD* as holding that contested-case proceedings can never give rise to a statement that meets the APA's general applicability standard. In that case, the supreme court concluded that the field rules emanating from a contested-case proceeding were not statements of general applicability *because they affected only individual interests in a specific field and had no impact on other oil and gas fields in the state. See WBD*, 104 S.W.3d at 79. That is not the situation presented here; the policy the Board articulated and applied in this case has statewide ramifications that extend far beyond the specific party to the contested-case proceeding.

As a general proposition, "[u]nless mandated by statute, the choice by an agency to proceed by general rule or by ad hoc adjudication is one that lies primarily in the informed discretion of the agency." *State Bd. of Ins. v. Deffebach*, 631 S.W.2d 794, 799 (Tex. App.–Austin 1982, writ ref'd n.r.e.) (citing *SEC v. Chenery Corp.*, 332 U.S. 194 (1947)). The APA is a statute that mandates the procedures by which agencies are permitted to adopt rules, and in *Mega Child Care*, the Texas Supreme Court affirmed the unremarkable proposition that the APA must be applied according to its plain language absent an express conflict with an agency's enabling statute. 145 S.W.3d at 199 ("[I]n the absence of express statutory language [in the agency's enabling statute] prohibiting judicial review, a legislative intent to prohibit judicial review [otherwise afforded under the APA] must be established by specific legislative history or other reliable evidence of intent."). There is nothing in the TPA that support's the conclusion that the TPA's general grant of rulemaking authority or limited grant of adjudicatory authority categorically trumps the APA's mandate that agencies are to adopt rules of general applicability via notice-and-comment rulemaking.

With regard to rulemaking, the TPA states:

(a) The board shall adopt rules consistent with this subtitle for the administration and enforcement of this subtitle.

(b) If the board determines it necessary to protect the health and welfare of the citizens of this state, the board may make a rule concerning the operation of a licensed pharmacy located in this state applicable to a pharmacy licensed by the board that is located in another state.

(c) The board shall adopt rules regarding records to be maintained by a pharmacist performing a specific act under a written protocol.

(d) The board by rule shall specify minimum standards for professional responsibility in the conduct of a pharmacy.

35

Tex. Occ. Code § 554.051. Thus, the TPA authorizes the Board to adopt rules but is silent with regard to the method or methods by which the Board may do so. The APA, on the other hand, is not silent about how agencies are required to adopt rules. *See* Tex. Gov't Code §§ 2001.0225-.036. Nevertheless, relying on the presumption that agencies have some discretion to select the method for adopting rules in the absence of a statutory prohibition, the Board now argues that the absence of an *express prohibition against* adjudicative rulemaking is all that is required to supersede the APA's plain directive. Such a position, however, is contrary to bedrock principles of statutory construction, which eschew reliance on extrinsic construction aids that alter a statute's plain meaning. *See Shook v. Walden*, 304 S.W.3d 910, 917 (Tex. App.—Austin 2010, no pet.) (courts may resort to rules of construction or extrinsic aids only when statutory text is ambiguous); *cf. generally Mega Child Care*, 145 S.W.3d at 173 (holding that plain language of APA provides independent right to judicial review when agency's enabling statute neither specifically authorizes nor specifically prohibits judicial review).

In the present case, the TPA does not contain any language that limits the APA's mandate that agencies use notice-and-comment procedures to adopt rules, including making them available for public inspection and comment. *See* Tex. Gov't Code §§ 2001.004-.005, .0225-.034. Nor is there any other evidence of clear legislative intent to override or limit the APA's scope or to expand the Board's rulemaking authority.[11] Applying the APA as written, that statute provides the

[11] To the contrary, when the TPA was enacted in 1981, the statute expressly required the Board to adopt rules in accordance with the APA. *See* Act of May 28, 1981, 67th Leg., R.S., ch. 255, § 16(a), 1981 Tex. Gen. Laws 638, 645 ("The rules shall be adopted, amended, or repealed in accordance with the Administrative Procedure Act."). During a

procedures required for the Board to adopt rules or regulations of general applicability. Although narrow exceptions have been recognized where necessary to allow the agency to accomplish its functions, the Board has cited none that would apply under the facts of this case, as we previously discussed and further explain here.

To the extent the Board has "discretion" to adopt, repeal, or modify rules in an adjudicative proceeding by virtue of its statutory authority to adjudicate disciplinary actions, the case law cannot be read to support the unfettered discretion alluded to in the Board's motion for

---

nonsubstantive codification in 1999, the foregoing language referring to compliance with the APA was removed. *See* Act of May 28, 1999, 76th Leg., R.S., ch. 388, § 1, 1999 Tex. Gen. Laws 1431, 1949 (current version at Tex. Occ. Code § 554.051). But according to a "Revisor's Note" to the revised statute, the sentence requiring adoption of rules under the APA was deleted as "unnecessary" because the APA, by its express terms, applies to all agencies: "The revised law omits as unnecessary the portion of [the prior statute] that requires rules to be adopted, amended, or repealed in accordance with the Administrative Procedure Act. Chapter 2001, Government Code, requires each agency to follow that law in adopting rules." *Id.* (Revisor's Note). Notwithstanding this explanation, the Board asserts that the deletion of the reference to the APA means that, under the TPA, the Board has complete discretion to adopt rules in individual adjudications without regard to the APA. We disagree.

Although a revisor's note cannot vary the plain language of a statute, the ability to proceed via "adjudicative rulemaking" is not included anywhere in the TPA. Therefore, the discretion to forgo compliance with APA rulemaking procedures could exist only by resorting to an extra-textual presumption that would create a conflict with the APA's plain language. Harmonizing the TPA and APA to avoid such a conflict—and consistent with the legislature's intent in adopting both statutes—the APA must be construed to govern the Board's rulemaking activities in the absence of an express provision in the TPA to the contrary or clear evidence of legislative intent to restrict the APA's scope and applicability vis-á-vis the Board. *Cf. Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 199 (Tex. 2004) ("In the absence of express statutory language prohibiting judicial review, a legislative intent to prohibit judicial review [despite independent right provided by the APA] must be established by specific legislative history or other reliable evidence of intent."); *cf. also Texas Indus. Energy Consumers v. CenterPoint Energy Hous. Elec. LLC*, 324 S.W.3d 95, 107 (Tex. 2010) (resort to "specific-controls-over-general maxim" is unnecessary because maxim only applies if overlapping statutes cannot be reconciled and court was able to construe two provisions to harmonize rather than conflict).

rehearing. Rather, the principle of "informed discretion" has long been tempered by "[a] presumption [that] favors adopting rules of general applicability through the [APA's] formal rulemaking procedures as opposed to administrative adjudication." *Rodriguez*, 997 S.W.2d at 255; *see Railroad Comm'n of Tex. v. Lone Star Gas Co.*, 844 S.W.2d 679, 688-689 (Tex. 1992); *cf. City of El Paso v. Public Util. Comm'n of Tex.*, 883 S.W.2d 179, 189 n.21 (Tex. 1994) (observing that agency "discretion to proceed on a 'case-by-case basis is not absolute" and that agency is "bound to follow the [APA's] formal rulemaking procedures" when circumstances supporting ad hoc adjudication are not present). Thus, when an agency seeks to adopt rules of general applicability, there is a "presumption favoring the fairness and public participation that accompany formal rulemaking under the APA" because "[a]llowing an agency to [amend] its rules through administrative adjudication . . . undercuts the APA."[12] *Rodriguez*, 997 S.W.2d at 255.

In "exceptional cases," an agency "may choose to formulate and enforce a general requirement through a decision in a particular case," but that may be done only when "using the rulemaking procedure would frustrate the effective accomplishment of the agency's functions." *Id.* (citing *Lone Star Gas Co.*, 844 S.W.2d at 689, and *Amarillo Indep. Sch. Dist. v. Meno*, 854 S.W.2d 950, 958 (Tex. App.—Austin 1993, writ denied)). Courts have recognized that ad hoc rulemaking "may be" appropriate, for example, when the agency is presented with a novel issue; when a dispute deals with a problem that is too technical, complex, or varied to be captured within

---

**12** Although the Board attempts to distinguish *Rodriguez* on the basis that its holding is limited to *amendments* of rules made on an ad hoc basis, it is axiomatic that amending a rule is substantively, legally, and effectively indistinguishable from adopting a new rule or repealing an old one.

38

the bounds of a general rule; or to fill in the interstices of a new statute or rule. *See, e.g.*, *Rodriguez*, 997 S.W.2d at 255; *City of El Paso*, 883 S.W.2d at 188-89 & n.21 (citing *Chenery*, 332 U.S. at 202-03, and *Southwestern Bell Tel. Co. v. Public Util. Comm'n of Tex.*, 745 S.W.2d 918, 926-27 (Tex. App.—Austin 1988, writ denied)); *see also* Beal, *supra*, 56 Baylor L. Rev. at 16 ("[N]otice and comment rulemaking procedures must be utilized unless a bona fide exception exists."). As stated in our original opinion, none of these circumstances applies to the reciprocal-sanctions policy at issue here. Even on rehearing, the Board has offered no exceptional circumstances to support adopting the reciprocal-sanctions policy on an ad hoc basis.

The Board asserts that the reciprocal-sanctions policy was not newly adopted in Witcher's case, or even in *Nealy*, but instead was adopted in contested cases 30 years ago (or over the course of the past 30 years) to address the issue at a time when it was "novel." That proposition, however, is not supported by the plethora of Board decisions submitted for the first time in its motion for rehearing, nor by the history of the statutes governing pharmacist licensing. Until *Nealy* and the order in the present case, there is no indication that the results were governed by a prospective policy of general applicability rather than the significantly more egregious and entirely distinguishable factual and procedural circumstances presented in those cases. Moreover, this is not an issue that was unfamiliar to the legislature or the Board when the TPA was enacted. Indeed, suspension, revocation, cancellation, or restriction of an out-of-state license has been a basis for disciplining a Texas licensee since the TPA's inception.[13] The reciprocal-sanctions policy simply

---

[13] *See generally* Acts 1973, 63d Leg., R.S., ch. 286, § 1, 1973 Tex. Gen. Laws 677, 678. (authorizing Board to issue Texas pharmacy license by reciprocity on applicant's satisfaction of certain conditions) (repealed); Act of May 28, 1981, 67th Leg., R.S., ch. 255, §§ 22(a)(5), 26(a)(15),

does not address any novelty in the regulation of pharmacists that had not already been contemplated by the legislature in enacting the TPA.

Even if the issue had been "novel" at an earlier time, there are several other reasons why the Board would have abused its discretion in continuing to apply an ad hoc rule, including that any novelty or exigencies that might have previously warranted a deviation from the APA's procedures or the need for continued reliance on an ad hoc rule should have been temporary and lasted only so long as reasonably necessary to allow the Board an opportunity to comply with the APA in adopting the rule.[14] *See City of El Paso*, 883 S.W.2d at 188-89 & n.21; *cf.* Tex. Gov't Code

1981 Tex. Gen. Laws 638, 652, 54 (current versions at Tex. Occ. Code §§ 558.101, 565.001(a)(16), 565.051) (prohibiting Board from issuing Texas pharmacy license by reciprocity if applicant had license granted by another state "suspended, revoked, canceled or otherwise restricted for any reason" and authorizing a range of disciplinary actions against Texas licensee or applicant whose "license to practice pharmacy issued by another state [was] canceled, revoked, or suspended for conduct substantially equivalent" to conduct that would subject pharmacist to discipline under TPA); Act of May 28, 1987, 70th Leg., R.S. ch. 262, §§ 3, 5, 1987 Tex. Gen. Laws 1584, 1585 (current versions at Tex. Occ. Code § 558.051(a)(F), 559.005(a)) (amending TPA to prohibit initial licensing by examination if pharmacist had license issued by another state "suspended, revoked, canceled, surrendered, or otherwise restricted for any reason" and prohibiting Texas licensee from obtaining new license upon same circumstances if Texas license lapsed without renewal for two or more years).

[14] Over the years, the Board has promulgated rules governing disciplinary sanctions on several occasions but failed to formally adopt the reciprocal-sanctions rule until June 2012, *after* its decision in Witcher's case. *See* 22 Tex. Admin. Code § 281.67 (Texas State Bd. of Pharmacy, Sanctions for Out-of-State Disciplinary Actions). The Board's regulatory history reveals that, in March 2000, it promulgated a rule expressly setting forth aggravating and mitigating factors as guidelines for determining the appropriate sanction in disciplinary actions under section 565.001 of the TPA, but the Board apparently was not moved at that time to include its "long-standing" reciprocal-sanctions policy in the new rule. *See* 25 Tex. Reg. 2574 (Mar. 24, 2000) (former 22 Tex. Admin. Code § 281.57). Nor was it moved to do so when the rule was amended in 2005 and later repealed and replaced in 2006, both of which occurred after the Board's decision in *In re Nealy*, Bd. Order #N-03-005 (May 10, 2005). *See* 30 Tex. Reg. 7874 (Nov. 25, 2005) (former 22 Tex. Admin. Code § 281.57); 22 Tex. Admin Code § 281.62 (current version). Instead, "disciplinary actions taken by any regulatory agency of the federal government or any state" was

§ 2001.034 (agency may enact "emergency rule without prior notice or hearing" upon finding "imminent peril to public health, safety, or welfare" but such rule may be used *only temporarily* pending adoption following APA's notice-and-comment rulemaking procedures). The availability of the APA rulemaking process and the amenability of the subject matter to promulgation as a formal rule support the presumption favoring the fairness and public participation that accompany notice-and-comment rulemaking under the APA.[15]

In sum, the Board's motion for rehearing does not persuade us that *WBD* requires a different outcome in this case. Nor does it persuade us that the Board appropriately adopted the reciprocal-sanctions policy as a rule of general applicability without complying with the APA.

---

included in the sanctions guidelines as *one factor among many* that could be considered.

[15] The inadvisability of allowing the Board to freely adopt, amend, or repeal its rules in disciplinary proceedings is further demonstrated by the TPA's confidentiality provisions, which preclude the Board from publicly disclosing the contents of an order disciplining an impaired pharmacist. *See* Tex. Occ. Code §§ 564.002 ("All records and proceedings of the board, an authorized agent of the board, or a pharmaceutical organization committee relating to the administration of this chapter (governing Texas's program to aid impaired pharmacists and pharmacy students) are confidential and are not considered public information . . . ."), .003 ("The board may disclose that the license of a pharmacist who is the subject of [a confidential] order . . . is suspended, revoked, canceled, restricted, or retired . . . [but] may not disclose the nature of the impairment or other information that resulted in the board's action."). Because the Board's orders are not uniformly made available for public inspection, using the disciplinary adjudicative process to announce new, amended, or repealed rules of general applicability would hinder the goals of openness and public participation reflected in the APA's provisions. *See, e.g.*, Tex. Gov't Code § 2001.004 (requiring agencies to make available for public inspection "all rules and other written statements of policy or interpretations that are prepared, adopted, or used by the agency in discharging its functions"); *see also Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 255-56 (Tex. 1999) ("[I]nformally amending this rule through a contested case hearing or an appeals panel decision results in the 'issuance of private opinion that will never be known by anyone except those few persons who take the time to research the files of an agency.'" (quoting Ron Beal, *Ad Hoc Rulemaking: Texas Style*, 41 Baylor L. Rev. 101, 120 (1989))).

**The Board's Other Arguments in its Motion for Rehearing**

The Board also complains that we are required to uphold the Board's decision if there is a rational basis underlying the reciprocal-sanction policy and if there is some evidence that it is applicable under the facts of Witcher's case. However, an agency's legislative rule is binding on all concerned, including the judicial department, only if the rule is (1) reasonable, (2) within the power delegated to the agency, and (3) *the product of proper procedure. General Elec. Credit Corp. v. Smail*, 584 S.W.2d 690, 694 (Tex. 1979) (citing and quoting K. Davis, Administrative Law Treatise § 5.03 (1958 ed. and Supps.)); *Sharp v. Cox Tex. Publ'ns, Inc.*, 943 S.W.2d 206, 209 (Tex. App.—Austin 1997, no writ). "When an agency promulgates a rule without complying with proper rule-making procedures, the rule is invalid." *El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n*, 247 S.W.3d 709, 715 (Tex. 2008). Having concluded that the rule here is not the product of proper procedure, it lacks the force of law without regard to its reasonableness vel non.

The Board also complains that the trial court erred in limiting the scope of remand to a determination of an appropriate sanction based on the established record and the affirmed fact findings and conclusions of law, which were not challenged below or on appeal. The Board contends that the *only* remedy for applying an improperly promulgated rule is remand for entirely new proceedings affording Witcher notice of the rules of decision to be applied, including the reciprocal-sanctions policy. *Cf. Texas State Bd. of Pharmacy v. Seely*, 764 S.W.2d 806, 814 (Tex. App.—Austin 1988, writ denied) ("Assum[ing], *without deciding*, that the Board [of Pharmacy] possessed authority to promulgate official policy as to what that norm or standard [of conduct] should be; that it promulgated a valid policy consistent with the statutory provisions committed to

42

the Board's administration; and that it permissibly promulgated and applied that policy retroactively in the course of adjudicating Seely's case, rather than formulating and promulgating that policy under the rulemaking provisions of [the predecessor to the APA] to be applied prospectively"—*all such assumptions being necessary to valid license-revocation order*—due process required, at minimum, that Board give pharmacist prior notice of legal criteria Board would apply to his conduct); *Madden v. Texas Bd. of Chiropractic Exam'rs*, 663 S.W.2d 626-27 (Tex. App.—Austin 1983, writ ref'd n.r.e.) (chiropractic board "arguably" had discretion to announce and apply new definition in ad hoc adjudicative proceeding rather than by promulgation of general rule through exercise of its rulemaking power, but, at minimum, due process required prior notice of legal criteria and hearing relative to issues that would actually control result). In the present appeal, the Board did not challenge the trial court's order with respect to the scope of remand. Accordingly, if there is any error in that regard, it has been waived. *See Secure Comm, Inc. v. Anderson*, 31 S.W.3d 428, 430-31 (Tex. App.—Austin 2000, no pet.) (holding that appellant waives right to complain of ruling to which no error was assigned).

Finally, the Board summarily asserts that sovereign immunity bars Witcher's claims against the individual appellants who were sued in their official capacity.[16] Subject to the limited "ultra vires" exception, sovereign immunity protects state officers sued in their official capacities to the same extent that it protects their employers. *See, e.g.*, *University of Tex. Med. Branch at*

---

[16] Although courts occasionally use the terms "sovereign immunity" and "governmental immunity" interchangeably, they are distinct concepts. *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 694 n.3 (Tex. 2003). The Board generally asserts that its board members and executive director enjoy "immunity" from suit in their official capacities. We construe this as a claim of "sovereign immunity," which refers to the state's immunity from suit and liability and extends not only to the state but also to various divisions of state government, including agencies, boards, hospitals, and universities. *Id*.

*Galveston v. Hohman*, 6 S.W.3d 767, 776 (Tex. App.—Houston [1st Dist.] 1999, pet. dism'd w.o.j.) ("[T]o the extent [the nurse] was acting in her official capacity, she enjoys the same governmental immunity as UTMB on [the plaintiff's] claims under the Nurse Reporting Act."). The Texas Supreme Court has explained the derivative nature of a state official's immunity as follows:

> When a state official files a plea to the jurisdiction, the official is invoking the sovereign immunity from suit *held by the government itself*. It is fundamental that a suit against a state official is merely "another way of pleading an action against the entity of which [the official] is an agent." A suit against a state official in his official capacity "is not a suit against the official personally, for the real party in interest is the entity." Such a suit actually seeks to impose liability against the governmental unit rather than on the individual specifically named and "is, in all respects other than name, . . . a suit against the entity."

*Texas A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 844 (Tex. 2007) (internal citations omitted) (emphasis added); *see also, e.g.*, *De Mino v. Sheridan*, 176 S.W.3d 359, 365 (Tex. App.—Houston [1st Dist.] 2004, no pet.). ("It is a well-established and generally accepted principle of law that suit against a government employee in his official capacity is, in all respects, a suit against the governmental unit."). It is undisputed in this case that the Board's immunity from suit is waived by section 2001.171 of the APA.[17] Because the Board is not immune from suit, neither are the individual appellants who were sued in their official capacities.

We overrule the Board's motion for rehearing.

### CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

---

[17] *See* Tex. Gov't Code § 2001.171 (authorizing an aggrieved person to file suit for judicial review of agency's final decision in contested case); *Mega Child Care*, 145 S.W.3d at 198 (recognizing APA's limited waiver of sovereign immunity for suits for judicial review).

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Goodwin and Field
  Dissenting Opinion by Justice Goodwin

Affirmed on Motion for Rehearing

Filed:   October 31, 2014